*22
 
 Opinion
 

 WALKER, J.
 

 In these consolidated appeals, plaintiffs and appellants
 
 [1]
 
 appeal from adverse judgments in their action for damages based on alleged fraud, conspiracy and willful misconduct in the design, construction, inspection and repair of the concrete foundations underlying their homes in Foster City, and for rescission of settlement agreements and releases made in connection with their initial claims for repair of those foundations. The trial court granted motions
 
 in limine
 
 by respondents Centex Real Estate Corporation (Centex) and Donald H. Hillebrandt (Hillebrandt) pursuant to the litigation privilege of Civil Code section 47, subdivision (b)
 
 [2]
 
 and the parol evidence rule, to exclude all evidence of oral and written communications they made in response to appellants’ reports of damage to their home foundations, leading to the initial settlement of their dispute and execution of releases. Appellants entered into a stipulated judgment pursuant to
 
 Building Industry Assn.
 
 v.
 
 City of Camarillo
 
 (1986) 41 Cal.3d 810, 815-817 [226 Cal.Rptr. 81, 718 P.2d 68], in order to obtain immediate appellate review of the issues raised by the trial court’s grant of the motions
 
 in limine.
 
 Appellants contend the trial court erred in ruling that (1) the litigation privilege bars admission in evidence of allegedly fraudulent statements made prior to the initiation of litigation or any actual proposal to initiate litigation; and (2) the parol evidence rule bars the use of statements made prior to the execution of written releases to prove fraud in the inducement as a basis for rescission. We conclude that the trial court erred in granting the motions
 
 in limine,
 
 and therefore reverse the judgment.
 

 Factual and Procedural Background
 

 Appellants are the owners of homes in the Plum Island subdivision (Plum Island) of Foster City. Appellants’ homes were all constructed by respondent Centex. All the homes in Plum Island were built on land surrounded by a salt water lagoon connected with San Francisco Bay. Prior to development, Plum Island was a marsh used commercially for salt evaporation ponds.
 

 In 1976, Centex employed defendant Wilsey & Ham (W&H) to plan the foundations for the Plum Island homes. W&H designed eight-and-a-half-inch steel-reinforced concrete mat slabs resting directly on the soil. Both
 
 *23
 
 Centex and W&H were aware from previous soil reports that the Plum Island site was composed of compressible San Francisco Bay mud characterized by differential soil settlement and á high groundwater table composed of highly corrosive salt water. Earlier soil studies had warned of the importance for foundation design of slab rigidity to prevent cracking, and a waterproof moisture barrier or membrane to prevent intrusion of groundwater into the concrete slab and corrosion of the interior steel reinforcement. After W&H performed its design work in 1977, construction of the homes was substantially completed by January 1978.
 

 In 1986 and early 1987, Centex and its insurer, defendant The Travelers Indemnity Company of Illinois (Travelers), received complaints of cracking in the concrete foundations of various homes in Foster City. Centex obtained a chemical analysis of soil and concrete samples from one or more of these residences, indicating concentrations of highly corrosive minerals associated with the infiltration of brackish sea water. Centex and Travelers retained the engineering firm of respondent Hillebrandt to investigate the problem at one residence (the Mullins home) and recommend a solution. Hillebrandt undertook extensive site investigation at the Mullins home, including removing portions of the slab, taking several core samples to perform laboratory tests on the strength of the concrete, and excavating a portion of the soil underneath the foundation. In January 1987, Hillebrandt reported on his findings. He recommended removal of extensive portions of the concrete foundation and its replacement with a new, more heavily reinforced foundation system extending deeper than the original slab. The recommended work at the Mullins home was subsequently accomplished.
 
 [3]
 

 Beginning in 1987, appellants began to notice cracks and rust stains appearing in the foundations of their homes. They contacted Centex and asked that the problems be investigated and corrected. Centex and Travelers retained Hillebrandt and defendant Wiss, Janney, Elstner Associates, Inc. (Wiss), another engineering firm, to investigate appellants’ complaints and recommend a solution.
 

 Boris Bresler of Wiss personally inspected the cracking and rust stains at several of the affected homes, including the Mullins home. Bresler was aware that all the Plum Island homes were built on marine mud fill in former salt evaporation ponds with a very high water table, with the consequent danger of highly corrosive marine water penetrating the concrete slab foundations of the homes. He also knew that the plans for the original foundations did not include any moisture barrier membrane between the concrete
 
 *24
 
 slab and the underlying soil. Wiss prepared a proposal designed only to repair cracks at the perimeters of appellants’ foundations, without addressing possible interior corrosion of metal rebar reinforcement within the concrete slabs.
 

 Hillebrandt inspected the homes of each of the appellants between July 1987 and May 1988, and then reported to Travelers in writing. Hillebrandt’s investigations of appellants’ homes were not as thorough or extensive as those he had performed a few months earlier in connection with the foundation problems at the Mullins home. Hillebrandt’s reports stated that the cracking and staining in the foundations of appellants’ homes were caused by the placement of anchor bolts and perimeter steel reinforcing bars too close to the edge of the foundation slab. Rather than replacing the concrete slab system around the perimeter of the foundations, as it had earlier recommended for the Mullins home, Hillebrandt now proposed installing new concrete footing
 
 adjacent
 
 to portions of the foundation perimeters in accordance with the plans prepared by Wiss. Each appellant was provided with a copy of Hillebrandt’s report on their respective homes.
 

 In accordance with Hillebrandt’s recommendations, Travelers solicited bids from defendant Soil Engineering Construction, Inc. (SEC), to carry out the proposed repairs. SEC submitted separate bids directly to the individual appellants for the repair work at each of the four homes. In exchange for appellants’ execution of general releases, Travelers offered to pay appellants the exact amount of the cost of repair, plus up to $4,000 to cover the additional cost of engineering fees for inspection during the repair. Between February 1988 and May 1989, appellants executed their respective releases and accepted Travelers’ settlement offer to pay for the repair work by SEC and the consulting engineer’s inspection.
 
 [4]
 

 In the course of its inspection during the repair project, consulting engineer Neil Moore & Associates (Moore) became aware that the possible problems with the foundations were actually more extensive than indicated
 
 *25
 
 by Hillebrandt and Wiss. Moore was concerned that the problems had not been adequately investigated, and that the repair work would not solve the underlying defects and possible corrosion. Although Moore suspected Centex, Travelers and Hillebrandt were withholding important information from it and from appellants, it did not pursue its suspicions or inform appellants about its questions. SEC completed the repairs on the four homes in 1988 and 1989.
 

 In late 1993 and early 1994, appellants discovered new large cracks in the foundations of their homes, and learned that the cracking in their foundations was caused by fundamental design problems not addressed by the repair project. Among other things, they discovered that the interior corrosion of reinforcing steel and resulting destruction of the concrete foundation slabs was more extensive and severe than suggested in Hillebrandt’s reports.
 

 Appellants filed suit against Centex, Hillebrandt, Wiss, Travelers, W&H and SEC in two separate actions in November 1993 and September 1994, alleging causes of action for fraud, conspiracy to defraud, misrepresentation, willful misconduct, negligence, breach of contract and breach of warranty. The complaints sought rescission of the release agreements and consequential and punitive damages.
 

 Centex moved for judgment on the pleadings in the Edwards plaintiffs’ case, and demurred in the case of the Piper plaintiffs. The trial court denied the motion for judgment on the pleadings and overruled the demurrer as to all causes of action with the exception of the second and third causes of action for negligent and reckless misrepresentation. Thereafter, the various defendants moved for summary adjudication and summary judgment as to all remaining causes of action against them. The trial court denied the motions of Hillebrandt and Centex as to the causes of action for fraud and willful misconduct on the grounds of triable issues of material fact. As to the causes of action for negligent and reckless misrepresentation, the trial court granted the motions on the ground that appellants’ claims were barred by the litigation privilege for statements made in the context of judicial proceedings under section 47(b). Centex petitioned for writ of mandate separately as to the two sets of plaintiffs, asking this court to overturn the trial court’s denial of the motions for summary adjudication. Both this court and the Supreme Court denied the petitions.
 
 [5]
 

 The cases of the Edwards and the Piper plaintiffs came to trial together. At the beginning of trial, Centex and Hillebrandt moved
 
 in limine
 
 pursuant to
 
 *26
 
 section 47(b) and the parol evidence rule to exclude, among other things, all prelitigation communications made by Centex, Hillebrandt, Travelers, or their consultants as evidence they had fraudulently induced appellants to execute the releases. Appellants opposed the motions. The trial court granted the motions, ruling that “all evidence of alleged oral or written communications by Centex, its counsel, its insurer or its consultants, made in response to plaintiffs’ written claims and during the resolution thereof ... is privileged and inadmissible” under section 47(b) and the parol evidence rule.
 

 Appellants entered into a stipulation under
 
 Building Industry Assn.
 
 v.
 
 City of Camarillo, supra,
 
 41 Cal.3d 810, 815-817, agreeing to entry of judgment on the merits in favor of respondents on all causes of action in order to facilitate immediate appellate review of the order granting the motions
 
 in limine.
 

 [6]
 

 The trial court entered judgment pursuant to the stipulation, and this appeal followed.
 

 Standard of Review
 

 A motion
 
 in limine
 
 is made to exclude evidence before the evidence is offered at trial, on grounds that would be sufficient to object to or move to strike the evidence. The purpose of a motion
 
 in limine
 
 is “to avoid the obviously futile attempt to ‘unring the bell’ in the event a motion to strike is granted in the proceedings before the jury.”
 
 (Hyatt
 
 v.
 
 Sierra Boat Co.
 
 (1978) 79 Cal.App.3d 325, 337 [145 Cal.Rptr. 47]; 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 2011, p. 1969.) In contrast to the usual motion
 
 in limine,
 
 which seeks to keep particular items of evidence from a jury, an “objection to all evidence” is essentially the same as a general demurrer or motion for judgment on the pleadings seeking to end the trial without the introduction of evidence. Such an objection is properly sustained where even if the plaintiff’s allegations were proven, they would not establish a cause of action.
 
 (Clemens
 
 v.
 
 American Warranty Corp.
 
 (1987) 193 Cal.App.3d 444, 451 [238 Cal.Rptr. 339];
 
 Miller
 
 v.
 
 McLaglen
 
 (1947) 82 Cal.App.2d 219, 223 [186 P.2d 48]; 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 272, p. 571; 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 954, pp. 410-411.)
 

 
 *27
 
 Here, respondents’ motions
 
 in limine
 
 were not directed to particular items of evidence. Instead, they sought to bar
 
 all
 
 statements made by respondents and the other defendants prior to execution of the releases on the grounds such statements were barred by the litigation privilege and the parol evidence rule. The oral and written communications excluded by the trial court’s grant of these motions constituted the bulk of the evidence upon which appellants base their causes of action for fraud and willful misconduct. By admitting the allegations of appellants’ complaints but challenging the admission of evidence in support of those allegations on the substantive law basis of the parol evidence rule and the affirmative defense of privilege, respondents’ motions effectively asserted that even if respondents made fraudulent statements to induce execution of the releases, appellants would still not be able to state any cause of action
 
 as a matter of law.
 
 In net effect, respondents’ motions
 
 in limine
 
 constituted an objection to any and all evidence on the grounds appellants’ pleadings were fatally defective and had failed to state a cause of action. As such, they operated as a general demurrer to appellants’ complaints or a motion for judgment on the pleadings.
 
 (Clemens
 
 v.
 
 American Warranty Corp., supra,
 
 193 Cal.App.3d at p. 452;
 
 Miller
 
 v.
 
 McLaglen, supra,
 
 82 Cal.App.2d at p. 223; 6 Witkin, Cal. Procedure,
 
 supra,
 
 Proceedings Without Trial, §§ 272-273, pp. 571-573.) Alternatively, because in this case the trial court granted these motions at the outset of trial with reference to evidence already produced in discovery, they may be viewed as the functional equivalent of an order sustaining a demurrer to the evidence, or nonsuit.
 
 (Gray
 
 v.
 
 Kircher
 
 (1987) 193 Cal.App.3d 1069, 1071-1072 [236 Cal.Rptr. 891];
 
 Bice
 
 v.
 
 Stevens
 
 (1954) 129 Cal.App.2d 342, 342-344, 350-356 [277 P.2d 106]; 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, §§ 405-407, pp. 408-411.)
 

 In either case, the scope of the trial court’s inquiry was relatively narrow. Both a demurrer and a motion for judgment on the pleadings accept as true all material factual allegations of the challenged pleading, unless contrary to law or to facts of which a court may take judicial notice. The sole issue is whether the complaint, as it stands, states a cause of action as a matter of law. (Code Civ. Proc., § 438;
 
 White
 
 v.
 
 Davis
 
 (1975) 13 Cal.3d 757, 765 [120 Cal.Rptr. 94, 533 P.2d 222];
 
 Alcorn
 
 v.
 
 Anbro Engineering, Inc.
 
 (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216];
 
 Daar
 
 v.
 
 Yellow Cab Co.
 
 (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732];
 
 Dale
 
 v.
 
 City of Mountain View
 
 (1976) 55 Cal.App.3d 101, 105 [127 Cal.Rptr. 520]; 6 Witkin, Cal. Procedure,
 
 supra,
 
 Proceedings Without Trial, §§ 262-265, pp. 563-567; 5 Witkin, Cal. Procedure,
 
 supra,
 
 Pleading, §§ 899-903, 954, pp. 357-364, 410-411.) The scope of a trial court’s inquiry on a motion for nonsuit is similarly limited. A motion for nonsuit or demurrer to the evidence concedes the truth of the facts proved, but denies as a matter of law
 
 *28
 
 that they sustain the plaintiff’s case. A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is
 
 no
 
 substantial evidence to support a judgment in the plaintiff’s favor. (Code Civ. Proc., § 581c;
 
 Carson
 
 v.
 
 Facilities Development Co.
 
 (1984) 36 Cal.3d 830, 838-839 [206 Cal.Rptr. 136, 686 P.2d 656];
 
 Campbell
 
 v.
 
 General Motors Corp.
 
 (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036];
 
 Cervantez
 
 v. J.
 
 C. Penney Co.
 
 (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975];
 
 Estate of Lances
 
 (1932) 216 Cal. 397, 400 [14 P.2d 768];
 
 Acme Galvanizing Co.
 
 v.
 
 Fireman’s Fund Ins. Co.
 
 (1990) 221 Cal.App.3d 170, 173-174 [270 Cal.Rptr. 405];
 
 Gray
 
 v.
 
 Kircher, supra,
 
 193 Cal.App.3d at pp. 1071-1072; 7 Witkin, Cal. Procedure,
 
 supra,
 
 Trial, §§ 405-412, pp. 408-414.)
 

 Under the record presented, we conclude the trial court’s grant of the motions
 
 in limine
 
 was tantamount to a nonsuit. We are bound by the same rules as the trial court. Therefore, on this appeal we must view the evidence most favorably to appellants, resolving all presumptions, inferences and doubts in their favor, and uphold the judgment for respondents only if it was required as a matter of law.
 
 (Carson
 
 v.
 
 Facilities Development Co., supra,
 
 36 Cal.3d at pp. 838-839;
 
 Miller
 
 v.
 
 Los Angeles County Flood Control Dist.
 
 (1973) 8 Cal.3d 689, 699 [106 Cal.Rptr. 1, 505 P.2d 193];
 
 Lawless
 
 v.
 
 Calaway
 
 (1944) 24 Cal.2d 81, 92-94 [147 P.2d 604];
 
 Acme Galvanizing Co.
 
 v.
 
 Fireman’s Fund Ins. Co., supra,
 
 221 Cal.App.3d at p. 174;
 
 Hilliard
 
 v. A.
 
 H. Robins Co.
 
 (1983) 148 Cal.App.3d 374, 415 [196 Cal.Rptr. 117].)
 

 The Litigation Privilege
 

 The principal issue on appeal is the extent of the litigation privilege as it applies to statements and communications made prior to the filing or initiation of a lawsuit. Respondents’ motions
 
 in limine
 
 sought to exclude all of their communications made in response to appellants’ reports of cracks in their home foundations, on the ground they are barred by the litigation privilege of section 47(b). Respondents contend that, although the communications were not made during a judicial proceeding or in the context of actual litigation, they are still privileged because they were made in anticipation of future litigation. The trial court agreed with respondents, and expressly based its grant of respondents’ motions
 
 in limine
 
 on the privilege set forth in section 47(b).
 

 Scope of the Privilege in a Prelitigation Context
 

 The litigation privilege in California has its genesis in section 47 of the Civil Code. That section states: “A privileged publication or broadcast is
 
 *29
 
 one made: [¶ . . . [¶ (b) In any ... (2) judicial proceeding ....’’ Despite its explicit wording, the privilege described by section 47(b) has been given expansive application by California courts. Although originally enacted with reference to defamation actions alone (see
 
 Oren Royal Oaks Venture
 
 v.
 
 Greenberg, Bernhard, Weiss & Karma, Inc.
 
 (1986) 42 Cal.3d 1157, 1163-1164 [232 Cal.Rptr. 567, 728 P.2d 1202]), the privilege has been extended to
 
 any
 
 communication, whether or not it is a publication, and to
 
 all
 
 torts other than malicious prosecution.
 
 (Rubin
 
 v.
 
 Green
 
 (1993) 4 Cal.4th 1187, 1193-1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044];
 
 Silberg
 
 v.
 
 Anderson
 
 (1990) 50 Cal.3d 205, 211-212, 215-216 [266 Cal.Rptr. 638, 786 P.2d 365]
 
 (Silberg); Albertson
 
 v.
 
 Raboff
 
 (1956) 46 Cal.2d 375, 380-382 [295 P.2d 405].) Thus, the privilege has been applied to suits for fraud
 
 (Carden
 
 v.
 
 Getzoff (1987)
 
 190 Cal.App.3d 907 [235 Cal.Rptr. 698];
 
 Steiner
 
 v.
 
 Eikerling
 
 (1986) 181 Cal.App.3d 639, 642-643 [226 Cal.Rptr. 694]), negligence and negligent misrepresentation
 
 (Pettitt
 
 v.
 
 Levy
 
 (1972) 28 Cal.App.3d 484, 487 [104 Cal.Rptr. 650]), and interference with contract
 
 (Pacific Gas & Electric Co.
 
 v.
 
 Bear Stearns & Co.
 
 (1990) 50 Cal.3d 1118 [270 Cal.Rptr. 1, 791 P.2d 587]).
 

 From the simple statement of the privilege in the original statute, the courts have derived this “usual formulation”: “[T]he privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. [Citations.]”
 
 (Silberg, supra,
 
 50 Cal.3d at p. 212.) As discussed in
 
 Silberg,
 
 these requirements for invoking the privilege are based upon section 47(b)’s perceived purpose of affording litigants and witnesses “the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.” In other words, the litigation privilege is intended to encourage parties to feel free to exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation. (50 Cal.3d at p. 213.)
 

 Closely related to this principal purpose is that of promoting “the effectiveness of judicial proceedings by encouraging ‘open channels of communication and the presentation of evidence’ in judicial proceedings,” on the rationale that “ ‘ “. . . the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible” . . . . ’”
 
 (Silberg, supra,
 
 50 Cal.3d at p. 213, citation omitted.) In order that witnesses may be free from the fear of lawsuits which otherwise might cause them to distort their testimony or refuse to testify altogether, “. . . courts have applied the
 
 *30
 
 privilege to eliminate the threat of liability for communications made
 
 during
 
 all kinds of truth-seeking
 
 proceedings:
 
 judicial, quasi-judicial, legislative and other official proceedings.”
 
 (Ibid.,
 
 italics added.)
 

 A third policy behind the privilege identified by the Supreme Court is that of promoting the effectiveness of judicial proceedings “by encouraging attorneys to zealously protect their clients’ interests.” Thus, the privilege is extended to attorneys to protect them from the fear of subsequent derivative actions for communications made in the context of judicial proceedings.
 
 (Silberg, supra,
 
 50 Cal.3d at p. 214.)
 

 Finally, the Supreme Court identified as further justification for the privilege the policy of placing “upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result.”
 
 (Silberg, supra,
 
 50 Cal.3d at p. 214.) In barring subsequent derivative actions based on the statements of witnesses, attorneys or parties during litigation, the privilege is intended to force litigants to utilize the available discovery apparatus to uncover the truth prior to final judgment.
 

 These four stated reasons for the privilege reflect our strong belief in the adversarial system as a means of attaining justice in the resolution of disputes. We recognize the necessarily harsh result of extending a privilege to false and fraudulent statements made in the course of a judicial proceeding. We accept that result, however, on account of the overriding importance of the competing public policy in favor of enhancing the finality of judgments and avoiding unending postjudgment derivative litigation—a policy which places the obligation on parties to ferret out the truth while they have the opportunity to do so
 
 during
 
 litigation.
 

 The language of section 47(b) itself expressly applies only to communications made “[i]n any . . . judicial proceeding.” The statute includes nothing about communications made in a prelitigation context, that is,
 
 before
 
 suit is filed. Nevertheless, the courts have applied the judicial privilege to certain discrete categories of communications made in advance of actual litigation. Thus, the privilege has long been applied to communications or complaints by citizens to public officials or authorities charged with investigating, prosecuting or remedying alleged wrongdoing. This has been by analogy with the related attorney-client privilege, on the theory that such open communication is a fundamental adjunct of the right of access to judicial and quasi-judicial proceedings.
 
 (Vogel
 
 v.
 
 Gruaz
 
 (1884) 110 U.S. 311, 314-316 [4 S.Ct. 12, 13-15, 28 L.Ed. 158];
 
 Silberg, supra,
 
 50 Cal.3d at
 
 *31
 
 p. 213;
 
 McClatchy Newspapers, Inc.
 
 v.
 
 Superior Court
 
 (1987) 189 Cal.App.3d 961, 970 [234 Cal.Rptr. 702];
 
 Tiedemann
 
 v.
 
 Superior Court
 
 (1978) 83 Cal.App.3d 918, 925 [148 Cal.Rptr. 242];
 
 Imig
 
 v.
 
 Ferrar
 
 (1977) 70 Cal.App.3d 48, 55 [138 Cal.Rptr. 540];
 
 Pettitt
 
 v.
 
 Levy, supra,
 
 28 Cal.App.3d at pp. 490-491.)
 

 Other early cases extending the litigation privilege to “communications” made prior to litigation concerned the recording or filing with a court clerk or county recorder of
 
 documents
 
 directly connected with the filing of a related lawsuit.
 
 (Albertson
 
 v.
 
 Raboff, supra,
 
 46 Cal.2d at pp. 380-382 [lis pendens];
 
 Wilton
 
 v.
 
 Mountain Wood Homeowners Assn.
 
 (1993) 18 Cal.App.4th 565, 569-571 [22 Cal.Rptr.2d 471] [condominium homeowners’ assessment liens];
 
 Frank Pisano & Associates
 
 v.
 
 Taggart
 
 (1972) 29 Cal.App.3d 1, 25 [105 Cal.Rptr. 414] [mechanic’s lien].)
 

 Following this initial expansion of the privilege to certain limited kinds of communications made before the filing of an action, the courts have further extended the statutory privilege beyond its original scope by applying it to a wide variety of other communications between parties in advance of litigation. In so doing, they have relied on language from the Second Restatement of Torts.
 
 (Laffer
 
 v.
 
 Levinson, Miller, Jacobs & Phillips
 
 (1995) 34 Cal.App.4th 117, 122-125 [40 Cal.Rptr.2d 233];
 
 Financial Corp. of America
 
 v.
 
 Wilburn
 
 (1987) 189 Cal.App.3d 764, 773,
 
 777
 
 [234 Cal.Rptr. 653];
 
 Fuhrman
 
 v.
 
 California Satellite Systems
 
 (1986) 179 Cal.App.3d 408, 419-423 [231 Cal.Rptr. 113], disapproved on other grounds in
 
 Silberg, supra,
 
 50 Cal.3d at pp. 212, 219;
 
 Herzog
 
 v.
 
 “A” Company, Inc.
 
 (1982) 138 Cal.App.3d 656, 660-662 [188 Cal.Rptr. 155];
 
 Lerette
 
 v.
 
 Dean Witter Organization, Inc.
 
 (1976) 60 Cal.App.3d 573, 577-578 [131 Cal.Rptr. 592];
 
 Block
 
 v.
 
 Sacramento Clinical Labs, Inc.
 
 (1982) 131 Cal.App.3d 386, 389-394 [182 Cal.Rptr. 438].) The result has been to transform the relatively simple statutory privilege for communications made
 
 in
 
 a judicial proceeding into an amorphous immunity encompassing all kinds of communications related to an
 
 “anticipated”
 
 lawsuit.
 
 (Rubin
 
 v.
 
 Green, supra, 4
 
 Cal.4th at p. 1194.) In this process, the courts have seemingly managed to redefine “in” as “out.”
 

 Sections 586, 587 and 588 of the Restatement deal generally with the judicial or litigation privilege for communications by attorneys at law, parties to a judicial proceeding, and witnesses to such proceedings, respectively. In addition to the standard statement of the privilege applied to communications made in the institution or in the course of a judicial proceeding, these sections of the Restatement set forth a privilege “to publish defamatory matter concerning another in communications
 
 preliminary
 
 to a
 
 proposed
 
 judicial proceeding.” (Rest.2d Torts, §§ 586-588, pp.
 
 *32
 
 247-248, 250, italics added.)
 
 [7]
 
 Each of these three sections is followed by clarifying commentary stating: “As to communications preliminary to a
 
 proposed
 
 judicial proceeding the rule stated in this Section applies only when the communication has some relation to a proceeding that is
 
 contemplated in good faith and under serious consideration.
 
 The
 
 bare possibility
 
 that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.” (Rest.2d Torts, §§ 586, 587, com. e, pp. 248, 250, italics added.)
 
 [8]
 

 Like the statutory privilege in section 47(b), the privilege set out in the Restatement is expressly limited to derivative defamation actions. Nevertheless, the California courts have not so limited the scope of the privilege in using the Restatement language to extend section 47(b) broadly to all communications made in a prelitigation context. Thus, it is now assumed that “communications with ‘some relation’ to an
 
 anticipated
 
 lawsuit” are protected by the privilege from any kind of derivative tort action, including one for fraud.
 
 (Rubin
 
 v.
 
 Green, supra,
 
 4 Cal.4th at p. 1194.)
 

 To date, most of the cases expanding the scope of section 47(b) to include communications made in a prelitigation context have done so without close analysis of what limitations, if any, should be placed on this extension of the legislatively created and judicially enhanced privilege. Relying on the strong public policy in favor of encouraging the settlement of disputes, respondents now argue that the privilege extends to all communications by any person involved in discussions or negotiations in connection with virtually any kind of dispute, whether or not litigation has actually been threatened, proposed, or seriously contemplated, as long as there is a possibility a lawsuit may be filed in the future. In practice, such an extension of the privilege would effectively permit a person or corporation to lie or make fraudulent miscommunications any time a claim is made, on the theory that the claim
 
 might
 
 ripen into an actual lawsuit. Such an extension of the privilege would swallow up much of the law of torts.
 

 
 *33
 
 Respondents’ interpretation of the litigation privilege is overbroad and incorrect. Although the privilege was initially a creature of statute, over the past 40 years the courts have expanded its reach well beyond the language used by the Legislature. At some point there must be a limit to this expansion. It is not too late in the day to establish the appropriate standards for extending the litigation privilege to communications made in anticipation of litigation. (Cf.
 
 Rubin
 
 v.
 
 Green, supra, 4
 
 Cal.4th at p. 1194.)
 

 The question that must be addressed is: At what point on the continuum between the mere possibility of an action and the reality of a filed lawsuit does the privilege attach? This is not an idle question. In the present litigious society, there is always at least the
 
 potential
 
 for a lawsuit any time a dispute arises between individuals or entities. More than a mere possibility or vague “anticipation” of litigation must be required for the privilege to attach, or else the privilege may be misused in ways for which there is a public policy justification or purpose. To paraphrase the words of the Restatement, the “bare possibility” that a judicial proceeding “might be instituted” in the future “is not to be used as a cloak to provide immunity” for fraud and other tortious conduct when the possibility has not ripened into a
 
 proposed
 
 judicial proceeding that is contemplated in good faith and under serious consideration. (Rest.2d Torts, § 588, com. e, p. 251.)
 

 In order to ensure that the privilege does not become merely a shield for fraud, the parameters of the privilege must be defined by the reasons providing justification for its existence. The fact that California courts have extended the judicial privilege to prelitigation communications by way of the Restatement does not change the underlying rationale and justification for the privilege, which remains the same whether the communications at issue are made in the course of an actual judicial proceeding or in a prelitigation context. As outlined in
 
 Silberg,
 
 the privilege is based on a policy of encouraging
 
 free access to the courts
 
 for assistance in the resolution of disputes and the ascertainment of truth, without fear of incurring a derivative tort action. Contrary to respondents’ position, the privilege cannot be applied to prelitigation communications simply because oí the existence of an entirely separate public policy of encouraging settlement. The strong public policy favoring settlement and the resolution of disputes without resort to litigation, with which we agree, is simply unrelated to the rationale of encouraging free access to the courts on which the privilege is based.
 

 For example, one of the justifications for the privilege emphasized in
 
 Silberg
 
 is to place the burden and responsibility on litigants of exposing the bias of witnesses and the falsity of evidence
 
 during trial,
 
 in order to enhance the finality of judgments.
 
 (Silberg,
 
 supra, 50 Cal.3d at p. 214.) During
 
 *34
 
 litigation, a panoply of procedural devices is available to all parties for the discovery of the truth. For this reason, it is frequently far more practicable for a party to uncover the truth and expose fraud after litigation has commenced than it is before a lawsuit is filed. Indeed, one of the principal reasons for protecting and promoting access to the courts is precisely so that parties may have access to the tools of discovery which are available in litigation, but for practical purposes are unavailable
 
 before
 
 suit is filed.
 
 [9]
 
 A prelitigation privilege that is extended too far in advance of litigation could promote fraudulent misrepresentations made to head off a lawsuit, when the victims of such misrepresentations have fewer means to discover the fraud. Such an extension of the privilege would actually hinder access to the tools of discovery available in litigation, thereby defeating one of the original purposes of the privilege itself. Thus, respondents’ argument using the promotion of settlement to justify the extension of the litigation privilege to prelitigation communications actually assigns the privilege a purpose that, in practice, is incompatible with its original rationale.
 

 The original purpose of applying the privilege to communications made
 
 during
 
 litigation was to encourage access to the courts for the resolution of disputes. This rationale for the privilege cannot logically be extended to communications made
 
 prior
 
 to or
 
 in anticipation
 
 of litigation until the prospect of litigation has gone from being a mere possibility to becoming a contemplated
 
 reality.
 
 From the four justifications for the privilege enumerated in
 
 Silberg
 
 and the specific language of the Restatement, we derive four closely related yet distinct considerations for distinguishing the point at which the litigation privilege may attach to statements in advance of litigation.
 

 First, the communication must have been made preliminary to a
 
 proposed
 
 judicial or quasi-judicial proceeding. (Rest.2d Torts, §§ 586-588 & com. e, pp. 247-251.) That is, a lawsuit or some other form of proceeding must actually be suggested or proposed, orally or in writing. Without some actual verbalization of the danger that a given controversy may turn into a lawsuit, there is no unmistakably objective way to detect at what point on the
 
 *35
 
 continuum between the onset of a dispute and the filing of a lawsuit the threat of litigation has advanced from mere possibility or subjective anticipation to contemplated reality.
 

 Second, the verbal proposal of litigation must be made
 
 in good faith.
 
 (Rest.2d Torts, §§ 586-588 & com. e, pp. 247-251.) It is not necessary that a party make an actual “threat” of litigation, as long as there is a serious, good faith proposal. By the same token even a threat to file a lawsuit would be insufficient to activate the privilege if the threat is merely a negotiating tactic and not a serious proposal made in good faith contemplation of going to court.
 
 [10]
 

 Third, the contemplated litigation must be
 
 imminent.
 
 Although this element is not expressly stated in the Restatement, it may be inferred from the requirements that the judicial proceeding be both “proposed” and “under serious consideration,” and not a “bare possibility.” (Rest.2d Torts, §§ 586-588 & com. e, pp. 247-251.) In practice, the Restatement requirement that litigation be “seriously considered” means that an offhand suggestion a given claim or dispute
 
 might
 
 result in a lawsuit would be insufficient to invoke the privilege. Unless and until the parties are negotiating under the actual threat of impending litigation, the original justification for the litigation privilege of encouraging access to the courts can have no relevance to their communications.
 

 Finally, the litigation must be proposed in order to obtain access to the courts
 
 for the purpose of resolving the dispute.
 
 This requirement is expressly derived from the justifications for the privilege outlined in
 
 Silberg,
 
 as well as inferentially from the language of the Restatement.
 
 (Silberg, supra,
 
 50 Cal.3d at pp. 212-214.) As seen, the justification for the litigation privilege is assuring freedom of access to the courts. Access to the courts is not an end in itself. Clearly, there is no public policy favoring litigation for its own sake. The civil courts exist as a means of settling disputes between people, for the larger purpose of insuring social peace. Thus, the fundamental purpose of the privilege is to provide a means for people to resolve their
 
 *36
 
 disputes without fear of “an unending roundelay of litigation.”
 
 (Id.
 
 at p. 214.)
 

 The critical point of each of these four elements is that the mere potential or “bare possibility” that judicial proceedings “might be instituted” in the future is insufficient to invoke the litigation privilege. (Rest.2d Torts, §§ 586-588, com. e, pp. 247-251.) In every case, the privileged communication must have some relation to an imminent lawsuit or judicial proceeding which is
 
 actually
 
 contemplated seriously and in good faith to resolve a dispute, and not simply as a tactical ploy to negotiate a bargain.
 
 (Silberg, supra,
 
 50 Cal.3d at pp. 212-214, 218;
 
 Laffer
 
 v.
 
 Levinson, Miller, Jacobs & Phillips, supra,
 
 34 Cal.App.4th at pp. 122-125;
 
 Financial Corp. of America
 
 v.
 
 Wilburn, supra,
 
 189 Cal.App.3d at pp. 773, 777;
 
 Fuhrman
 
 v.
 
 California Satellite Systems, supra,
 
 179 Cal.App.3d at pp. 419-423;
 
 Herzog
 
 v.
 
 “A” Company, Inc., supra,
 
 138 Cal.App.3d at pp. 660-662;
 
 Lerette
 
 v.
 
 Dean Witter Organization, Inc., supra,
 
 60 Cal.App.3d at pp. 577-578;
 
 Premier Communications Network, Inc.
 
 v.
 
 Fuentes
 
 (9th Cir. 1989) 880 F.2d 1096, 1102-1103 .) We therefore hold that the privilege attaches at that point in time that imminent access to the courts is seriously proposed by a party in good faith for the purpose of resolving a dispute, and not when a threat of litigation is made merely as a means of obtaining a settlement.
 
 [11]
 

 For this purpose, it is immaterial whether the party whose communications are at issue is a potential
 
 plaintiff
 
 intent on filing a lawsuit, or a potential
 
 defendant
 
 contemplating imminent litigation.
 
 (McBride
 
 v.
 
 Pizza Hut, Inc.
 
 (D.C.App. 1995) 658 A.2d 205, 207-208;
 
 General Elec. Co.
 
 v.
 
 Sargent & Lundy
 
 (6th Cir. 1990) 916 F.2d 1119, 1125-1129;
 
 Johnston
 
 v.
 
 Cartwright
 
 (8th Cir. 1966) 355 F.2d 32, 37-38; cf.
 
 Lerette
 
 v.
 
 Dean Witter Organization, Inc., supra,
 
 60 Cal.App.3d at p. 577.) Until a lawsuit is actually filed in a given case, there may be no way to know which party, if any, will be the first to the court house. As the Restatement makes clear, even a nonparty witness to a proposed judicial proceeding may be covered by the privilege. (Rest.2d Torts, § 588, com. e, p. 251.)
 

 This interpretation of the limitations of the privilege in a prelitigation context does not contradict or defeat the public policy favoring settlement of
 
 *37
 
 disputes. Parties will remain as free to negotiate in good faith as they have ever been. We simply decline to
 
 extend
 
 the privilege, as respondents would have us do, to all settlement negotiations. Such an approach would effectively condone fraud and deceit once any tort has been committed or claim has been made, on the theory that litigation “might” result. We need not encourage fraud in an effort to secure free access to the courts.
 
 [12]
 

 Trial Court’s Application of the Privilege in This Case
 

 In the procedural posture of this appeal from a judgment entered after the trial court granted what was in effect an objection to all the evidence at the beginning of trial, we must accept the allegations of appellants’ pleadings as true, resolve all inferences from the evidence in their favor, and uphold the judgment for respondents only if it was required as a matter of law.
 
 (Carson
 
 v.
 
 Facilities Development Co., supra,
 
 36 Cal.3d at pp. 838-839;
 
 Clemens
 
 v.
 
 American Warranty Corp., supra,
 
 193 Cal.App.3d at pp. 451-452;
 
 Gray
 
 v.
 
 Kircher, supra,
 
 193 Cal.App.3d at pp. 1071-1072;
 
 Bice
 
 v.
 
 Stevens, supra,
 
 129 Cal.App.2d at pp. 342-344, 350-356; 5 Witkin, Cal. Procedure,
 
 supra,
 
 Pleading, § 954, p. 410; 6 Witkin, Cal. Procedure,
 
 supra,
 
 Proceedings Without Trial, §§ 262-265, 272-273, pp. 563-567, 571-573; 7 Witkin, Cal. Procedure,
 
 supra,
 
 Trial, §§ 405-412, pp. 408-414.) Respondents had the burden of establishing the preliminary facts on which they base their affirmative defense of the litigation privilege.
 
 (Fuhrman
 
 v.
 
 California Satellite Systems, supra,
 
 179 Cal.App.3d at pp. 421-423; 5 Witkin, Cal. Procedure,
 
 supra,
 
 Pleading, §§ 1008-1010, 1027, pp. 461-465, 476-477.) Thus, as the parties moving
 
 in limine
 
 to bar admission of all prelitigation communications on the basis of the privilege, respondents were required to establish that at the time the communications were made, litigation was not a mere possibility on the horizon, but was actually proposed, seriously and in good faith, as a means of resolving the dispute.
 

 The record shows that respondents failed to make this showing of preliminary fact in support of their motions
 
 in limine.
 
 Respondents have never asserted that they intended suing appellants to resolve the dispute in this case, and there is certainly no evidence to this effect. Neither is there any
 
 *38
 
 evidence appellants were actually contemplating commencing legal proceedings, seriously and in good faith, against respondents. Appellants’ initial claims to Centex simply informed it of the cracks in their home foundations, and asked that the cracks be investigated and repaired. There was no threat or suggestion of a lawsuit. Thereafter, Centex and its insurer, Travelers, did not deny or dispute their obligation to repair the foundations. Instead, their communications with appellants focused on investigating, diagnosing and “repairing” the faulty foundations. In short, the record shows that appellants never suggested litigating their claims, threatened lawsuits, or even made any settlement demands on Centex, Hillebrandt, Travelers or any other defendant such as would justify respondents in a good faith apprehension that appellants
 
 in fact
 
 proposed resorting to the courts to resolve their dispute. Indeed, it is not clear from the record that there was even a “dispute” to be resolved before Centex and Travelers demanded that appellants execute the releases as a condition of repairing the foundations.
 

 Respondents assert that the preliminary factual basis for applying the litigation privilege in this case has been established by allegations in appellants’ complaints to the effect that respondents made their fraudulent misrepresentations and concealments in order to induce appellants to refrain from commencing litigation. On the basis of these allegations, respondents contend appellants have “admitted” that, at the time appellants reported the cracks in their foundations, respondents actually anticipated the possibility that appellants would sue them.
 
 [13]
 

 
 *39
 
 The principal fallacy of this argument is that appellants did not allege the necessary facts upon which the privilege could be founded. Appellants merely alleged that
 
 respondents
 
 intended, by means of fraudulent misrepresentations and omissions, to protect themselves from
 
 potential
 
 liability by inducing appellants not to pursue their rightful judicial remedies. Appellants have never alleged or admitted that at the time they informed Centex of the cracks in their foundations, appellants themselves were actually contemplating litigation, seriously and in good faith.
 

 Moreover, even if appellants had made such an allegation in their complaints, this still would not satisfy the requirements of the privilege in this prelitigation context. In order for respondents to be able to take advantage of the privilege by applying it to their own communications, they must establish that at the time they made the subject communications, they
 
 themselves
 
 actually contemplated prospective litigation, seriously and in good faith. (Rest.2d Torts, §§ 586-588, com. e, pp. 247-250;
 
 Laffer
 
 v.
 
 Levinson, Miller, Jacobs & Phillips, supra,
 
 34 Cal.App.4th at pp. 122-125;
 
 Financial Corp. of America
 
 v.
 
 Wilburn, supra,
 
 189 Cal.App.3d at pp. 773, 777-778;
 
 Fuhrman
 
 v.
 
 California Satellite Systems, supra,
 
 179 Cal.App.3d at pp. 419-423;
 
 Herzog
 
 v.
 
 “A” Company, Inc., supra,
 
 138 Cal.App.3d at pp. 660-662;
 
 Premier Communications Network, Inc.
 
 v.
 
 Fuentes, supra,
 
 880 F.2d at pp. 1102-1103.) The allegations of appellants’ complaints only state that respondents were trying to
 
 avoid
 
 potential litigation by acting in a way that would induce appellants not to pursue or even consider filing lawsuits until the statute of limitations had already run. Nowhere in their complaints do appellants allege respondents contemplated anything more than the mere
 
 possibility
 
 that appellants might consider litigation.
 

 This is insufficient. Respondents cannot obtain the benefits of the privilege to protect their own communications merely by establishing that they anticipated a potential for litigation between themselves and appellants arising out of some claim or dispute. As discussed, the privilege only arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a
 
 proposed proceeding
 
 that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute. (Rest.2d Torts, §§ 586-588, com. e, pp. 247-251.) Respondents’ statements to appellants are therefore unprotected by the privilege if there is no substantial evidence that, at the time respondents made the alleged misrepresentations, imminent litigation was seriously proposed and actually contemplated in good faith as a means of resolving the parties’ dispute.
 

 This is an issue of fact. For purposes of their motions
 
 in limine
 
 based on the affirmative defense of privilege, respondents had the burden of establishing all preliminary facts necessary to justify applying the privilege to their
 
 *40
 
 communications.
 
 (Laffer
 
 v.
 
 Levinson, Miller, Jacobs & Phillips, supra,
 
 34 Cal.App.4th at p. 124;
 
 Financial Corp. of America
 
 v.
 
 Wilburn, supra,
 
 189 Cal.App.3d at p. 777;
 
 Fuhrman
 
 v.
 
 California Satellite Systems, supra,
 
 179 Cal.App.3d at pp. 421-423.) Appellants’ complaints do not contain admissions or factual allegations establishing these preliminary facts. The trial court did not address them at all, much less make any factual findings supported by evidence. Viewing the record in a manner most favorable to appellants and resolving all inferences in their favor, it is clear that respondents failed to establish a basis for applying the litigation privilege to the subject evidence, and the trial court erred in granting their motions
 
 in limine
 
 on this ground.
 

 Other Contentions
 

 Appellants argue that section 47(b) does not bar admission of respondents’ alleged fraudulent misrepresentations for a variety of other reasons. Because this matter must be remanded for further proceedings, we address these arguments.
 

 First, appellants insist that the litigation privilege is inapplicable to the cause of action to rescind the releases because that cause of action assertedly sounds in contract and is therefore not the kind of derivative tort cause of action which the privilege is intended to prevent. The contention is meritless. Appellants’ cause of action for rescission seeks to void the releases based upon respondents’ fraud. The gravamen of the action therefore sounds in fraud, not in contract. It is upon this fraud that appellants assert the invalidity of the releases, in connection with the alleged larger underlying conspiracy to defraud appellants by preventing them from discovering respondents’ negligence in the design, building, and repairing of their home foundations.
 
 (Silberg, supra,
 
 50 Cal.3d at pp. 211, 220;
 
 Voth
 
 v.
 
 Wasco Public Util. Dist.
 
 (1976) 56 Cal.App.3d 353, 356 [128 Cal.Rptr. 608];
 
 Mahon
 
 v.
 
 Berg
 
 (1968) 267 Cal.App.2d 588, 590 [73 Cal.Rptr, 356]; cf.
 
 Little
 
 v.
 
 Speckert
 
 (1959) 170 Cal.App.2d 725, 726-727 [339 P.2d 611] [cause of action alleging breach of promise set forth in contract sounds in contract and not tort].)
 

 Appellants also contend that section 47(b) does not bar their causes of action against respondents for negligence and willful misconduct because those causes of action are based in part on evidence of respondents’ supposedly noncommunicative conduct of preparing a defective design for repair of the slab foundations, and making inadequate repairs. Conduct which is essentially communicative in nature is subject to the privilege.
 
 (Rubin
 
 v.
 
 Green, supra, 4
 
 Cal.4th at pp. 1195-1196;
 
 Kupiec
 
 v.
 
 American Internat.
 
 
 *41
 

 Adjustment Co.
 
 (1991) 235 Cal.App.3d 1326 [1 Cal.Rptr.2d 371].) Appellants’ causes of action for negligence and willful misconduct interpret respondents’
 
 conduct
 
 of designing and performing repairs to the foundations in light of their verbal
 
 communication
 
 to appellants of allegedly fraudulent diagnoses of, advice about, and recommendations for the foundation problems. Thus, the gravamen of appellants’ causes of action for negligence and willful misconduct was conduct that was essentially communicative in nature.
 

 Neither is there any merit to appellants’ contention that respondents’ prelitigation communications cannot be privileged because they constitute extrinsic fraud. Fraud is extrinsic when the defrauded party was deprived of the opportunity to present his or her claim or defense to a court.
 
 (Flood
 
 v.
 
 Templeton
 
 (1907) 152 Cal. 148, 155-156 [92 P. 78];
 
 In re Marriage of Stevenot
 
 (1984) 154 Cal.App.3d 1051, 1069 [202 Cal.Rptr. 116];
 
 Bernath
 
 v.
 
 Wilson
 
 (1957) 149 Cal.App.2d 831, 834-835 [309 P.2d 87].) Intrinsic fraud, on the other hand, is fraud which goes to the actual merits of the litigation. Unlike “extrinsic” fraud, it does not preclude any party from raising a claim or defense; nor does it prevent a party from knowing about or attending a proceeding.
 
 (La Salle
 
 v.
 
 Peterson
 
 (1934) 220 Cal. 739, 740 [32 P.2d 612];
 
 Los Angeles Airways, Inc.
 
 v.
 
 Hughes Tool Co.
 
 (1979) 95 Cal.App.3d 1, 9 [156 Cal.Rptr. 805];
 
 Burch
 
 v.
 
 Hibernia Bank
 
 (1956) 146 Cal.App.2d 422, 432-433 [304 P.2d 212].) Appellants’ allegations that respondents fraudulently misrepresented the extent of the damage to their foundations and the required repairs, clearly constitute allegations of intrinsic fraud covered by the privilege.
 
 (Silberg, supra,
 
 50 Cal.3d at p. 214.)
 

 Appellants also contend that section 47(b) is inapplicable to this litigation because it is based not simply on recent fraudulent communications made in anticipation of filing a lawsuit, but on a larger underlying conspiracy to defraud beginning no later than 1978. Thus, they assert that these lawsuits are not the kind of “derivative” actions that the privilege proscribes, but rather are “predicate” actions based on “original” torts not connected with any anticipated litigation. Appellants are correct that the prelitigation privilege does not apply to an “original” action based on alleged fraud occurring years before litigation is even foreseeable. Nevertheless, appellants cannot litigate their causes of action based on the initial 1978 fraud as long as the releases are in effect. They can only reach the
 
 initial
 
 underlying fraud by voiding the releases, which in turn they can only do by proving the more recent
 
 secondary
 
 fraud in the inducement. Thus, they cannot escape application of the privilege as long as there is some question whether or not this secondary fraud occurred at a point in time when imminent access to the courts was seriously proposed by a party in good faith for the purpose of resolving the dispute.
 

 
 *42
 
 Parol Evidence
 

 The trial court also excluded the subject evidence on the basis of the parol evidence rule. Respondents point to the terms of the releases acknowledging the possibility of unknown or future foundation damage and expressly waiving any claims based on such damage. They urge that appellants are attempting to alter these terms by alleging respondents made false implied promises that the proposed repairs would remedy all possible future foundation problems.
 

 Respondents’ argument misses the mark. It assumes appellants’ rescission claim is for promissory fraud based on alleged independent false promises by respondents contradicting the terms of the release. Such a claim would be barred by the parol evidence rule.
 
 (Alling
 
 v.
 
 Universal Manufacturing Corp.
 
 (1992) 5 Cal.App.4th 1412, 1433-1437 [7 Cal.Rptr.2d 718]; 2 Witkin, Cal. Evidence,
 
 supra,
 
 Documentary Evidence, § 1000, pp. 945-947.) Here, however, appellants argue for rescission of the releases based not on promissory fraud, but on fraud in the inducement or procurement through alleged misrepresentations of fact. (§ 1689, subd. (b)(1).) Evidence of such fraud is admissible in an action for rescission because it does not go to contradict the terms of the parties’ integrated agreement, but to show instead that the purported instrument has no legal effect. (Code Civ. Proc., § 1856, subds. (f) and (g);
 
 Ferguson
 
 v.
 
 Koch
 
 (1928) 204 Cal. 342, 346 [268 P. 342, 58 A.L.R. 1176];
 
 Ron Greenspan Volkswagen, Inc.
 
 v.
 
 Ford Motor Land Development Corp.
 
 (1995) 32 Cal.App.4th 985, 995-996 [38 Cal.Rptr.2d 783];
 
 People
 
 ex rel.
 
 Dept, of Parks and Recreation
 
 v.
 
 West-A-Rama, Inc.
 
 (1973) 35 Cal.App.3d 786, 793 [111 Cal.Rptr. 197]; 2 Witkin, Cal. Evidence,
 
 supra,
 
 Documentary Evidence, §§ 997, 999, pp. 944-945.) Thus, the trial court erred in granting respondents’ motions
 
 in limine
 
 on the ground of the parol evidence rule.
 

 Disposition
 

 The judgments in favor of respondents Centex and Hillebrandt are reversed. Respondents shall pay appellants’ costs on appeal.
 

 Corrigan, Acting P. J., and Parrilli, J., concurred.
 

 A petition for a rehearing was denied March 26, 1997, and respondents’ petitions for review by the Supreme Court were denied May 28, 1997.
 

 [1]
 

 The individual appellants in this consolidated appeal are Gordon Edwards, Maxine Edwards, Mary Horstmeyer, James Lawrence, Alice Lawrence, Malcolm Lynch, Beverly Ann Lynch, David Mandell, Virginia Marlene Mandell, Paul Piper, Susan Piper, Allan Hotti and Angelica Hotti. In this opinion, they will be referred to collectively as appellants. Where pertinent, the first nine appellants are sometimes referred to as the “Edwards plaintiffs” and the last four appellants are sometimes referred to as the “Piper plaintiffs.”
 

 [2]
 

 Unless otherwise indicated, all further statutory references are to the Civil Code. For convenience, we will refer to section 47, subdivision (b) as section 47(b).
 

 [3]
 

 The Mullins home was located in the Pitcairn subdivision of Foster City approximately one-half mile from the Plum Island subdivision. Hie Pitcairn subdivision had site and soil conditions similar to those on Plum Island. Like Plum Island, the homes in Pitcairn were built by Centex in the 1970’s, and used a similar slab foundation design by W&H.
 

 [4]
 

 Appellants agreed to release Centex, Hillebrandt, Travelers, and all others connected with the repair project “from any and all claims, demands, actions or causes of action, of any nature whatsoever whether based on tort, contract or any other theory of recovery or relief and whether for compensatory or punitive damages, in any way connected with the design and construction of the concrete slab foundation, adjoining soil areas, appurtenant items and surfaces, and the investigation of defects or damages claimed to such improvements” of their individual homes. In addition, appellants expressly agreed to a waiver of their rights under section 1542, and assumed the risk of any and all claims relating to the subject matter of the release, “for damage or other relief which exists as of this date, but which they do not know of or suspect to exist in their favor, whether through ignorance, oversight, error, negligence or otherwise and which, if known, would materially affect their decision to enter into this settlement. . . .”
 

 [5]
 

 The trial court granted the motions for summary judgment of both Travelers and W&H and entered judgment in favor of those defendants. Those judgments were previously appealed to this court in
 
 (Edwards
 
 v.
 
 Centex Real Estate Corp.,
 
 No. A069770). By opinion filed on October 16,1996 (nonpub. opn.), we affirmed the judgment in favor of W&H and reversed
 
 *26
 
 that in favor of Travelers. The trial court’s rulings on the motions for summary adjudication of Hillebrandt and Centex are not before us on this appeal.
 

 [6]
 

 “[I]t is ‘wasteful of trial court time’ to require the plaintiff to undergo a probably unsuccessful court trial merely to obtain an appealable judgment. . . . [H]ere plaintiff did not really consent to the judgment, but merely acknowledged that it could not win the case if it had the burden of proof. More important, there is an exception to the rule that a party may not appeal a consent judgment. If consent was merely given to facilitate an appeal following adverse determination of a critical issue, the party will not lose his right to be heard on appeal. [Citations.] We thus may address the merits of the issue [on appeal].”
 
 (Building Industry Assn.
 
 v.
 
 City of Camarillo, supra,
 
 41 Cal.3d at p. 817.)
 

 [7]
 

 Thus, section 588 of the Restatement Second of Torts states with regard to witnesses in judicial proceedings: “A witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he [or she] is testifying, if it has some relation to the proceeding.”
 

 [8]
 

 The language of comment e to section 588, dealing with witnesses, is slightly different from that in the corresponding comments following sections 586 and 587. Thus, comment e to section 588 states: “As to communications preliminary to a proposed judicial proceeding, the rule stated in this Section applies only when the communication has some relation to a proceeding that is
 
 actually
 
 contemplated in good faith and under serious consideration
 
 by the witness or a possible party to the proceeding.
 
 The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.” (Rest.2d Torts, § 588, com. e, p. 251, italics added.)
 

 [9]
 

 We recognize that the Code of Civil Procedure provides for certain procedures whereby, prior to commencement of an action, a person who “expects to be a party to any action that may be cognizable” in a California court may obtain discovery “for the purpose of perpetuating that party’s own testimony or that of another natural person or organization, or of preserving evidence for use in the event an action is subsequently filed.” (Code Civ. Proc., § 2035.) The provision is restricted to-these express situations, and specifically states: “One shall not employ the procedures of this section for the purpose either of ascertaining the possible existence of a cause of action or'h defense to it, or of identifying those who might be made parties to an action not yet filed.” For obvious practical reasons, the usefulness of this provision as a tool for prelitigation investigatory discovery is severely limited.
 

 [10]
 

 The classic example of an instance in which the privilege would attach to prelitigation communications is the attorney demand letter threatening to file a lawsuit if a claim is not settled.
 
 (Lerette
 
 v.
 
 Dean Witter Organization, Inc., supra,
 
 60 Cal.App.3d at pp. 577-578.) Nevertheless, because the privilege does not attach prior to the actual filing of a lawsuit unless and until litigation is seriously proposed
 
 in good faith
 
 for the purpose of resolving the dispute, even a threat to commence litigation will be insufficient to trigger application of the privilege if it is actually made as a means of inducing settlement of a claim, and not in good faith contemplation of a lawsuit. This is a question of fact that must be determined before the privilege is applied.
 
 (Laffer
 
 v.
 
 Levinson, Miller, Jacobs & Phillips, supra,
 
 34 Cal.App.4th at pp. 124-125;
 
 Fuhrman
 
 v.
 
 California Satellite Systems, supra,
 
 179 Cal.App.3d at pp. 421-422 & fn. 5;
 
 Herzog
 
 v.
 
 "A” Company, Inc., supra,
 
 138 Cal.App.3d at p. 662.)
 

 [11]
 

 Our holding does not conflict with the Supreme Court’s rejection of the “interest of justice” test in
 
 Silberg,
 
 with which we agree and to which we are of course bound.
 
 (Silberg, supra,
 
 50 Cal.3d at pp. 216-219.) In holding that the application of the existing privilege to statements made prior to litigation is not based on a policy of promoting settlement but on preserving access to the courts, we have no intention of reattaching an “interest of justice” requirement to application of the privilege. Rather, we are returning to the original purposes behind the enactment of the privilege to limit its expansion into areas to which it was not originally intended to apply.
 

 [12]
 

 Respondents have contended on the basis of
 
 Rubin
 
 v.
 
 Green, supra, 4
 
 Cal.4th 1187 that mere anticipation of a lawsuit is sufficient to invoke the litigation privilege. We do not read the decision in
 
 Rubin
 
 v.
 
 Green
 
 so broadly. In that case, the Supreme Court found the litigation privilege attached to statements made in a “ ‘notice of intention to commence action’ ” and in surrounding discussions about “the merits of [a] proposed . . . lawsuit . . . .”
 
 (Id.
 
 at pp. 1191, 1195.) From these facts, it is clear that the communications at issue in
 
 Rubin
 
 were related to a
 
 proposed
 
 lawsuit that was
 
 actually contemplated,
 
 seriously and in good faith, and were protected by the litigation privilege for this reason. Thus, our holding does not conflict with the result in
 
 Rubin
 
 v.
 
 Green.
 

 [13]
 

 Respondents base this assertion on the following allegations found in the complaints of both the Edwards plaintiffs and the Piper plaintiffs;
 

 (1) “Defendants . . . intended to deceive and to induce [appellants] to act in reliance upon the express and implied representations and in ignorance of the said concealed facts. . . and . . . further intended to continue said concealment to cause [appellants] to refrain from bringing appropriate legal action or otherwise pursuing their available remedies for Defendants’ many violations of various laws with respect to the design and construction of the properties”;
 

 (2) “After learning of [appellants’] claims, Defendants . . . , realizing that they were strictly liable for these claims became extremely concerned that in view of the fact that the 10-year statute of limitations . . . had not elapsed, they stood to lose millions of dollars for claims arising from the defective design and construction of the foundation systems of [appellants’] homes”;
 

 (3) “Thereafter, in order to minimize their liability, defendants . . . embarked on a scheme to continue the concealment of the design and construction defects as set forth above and to induce [appellants] further to refrain from taking appropriate legal action by defrauding [appellants] ... by inducing them by false representations and promises to release and waive their legal rights”; and
 

 (4) “[Appellants] being lay persons justifiably relied upon the representations and promises of the Defendants, . . . executed a general release in favor of defendants .... [and] refrained from prosecuting their legal remedies for the construction and design defects . . . within the time deadlines imposed by [the statute of limitations].”