Filed 12/21/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| KETRYN CORNELL,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>BERKELEY TENNIS CLUB,<br><br>    Defendant and Respondent. | A147516<br><br>(Alameda County<br>Super. Ct. No. RG-14-724804) |

Plaintiff Ketryn Cornell is a severely obese woman who was fired from the Berkeley Tennis Club after having worked there for over 15 years. She brought eight claims against the Club: three under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), for disability discrimination and failure to accommodate her disability (the discrimination/failure to accommodate claim), disability harassment, and retaliation; three for wrongful discharge in violation of public policy, based on her three FEHA claims; one for intentional infliction of emotional distress; and one for defamation. She appeals from a final judgment entered after the trial court granted the Club's motion for summary adjudication of all eight claims.[1]

We affirm in part and reverse in part. Under the law governing motions for summary adjudication, the Club had the initial burden to produce evidence that Cornell cannot establish at least one element of each claim. The Club failed to sustain this burden on the claims requiring Cornell to show that her obesity has a physiological cause. We therefore conclude that the trial court improperly granted summary adjudication of

---

[1] Cornell also brought claims for various violations of the Labor Code. These claims were settled and voluntarily dismissed with prejudice after the grant of summary adjudication.

the FEHA claims alleging that the Club discriminated against and harassed Cornell and the claim alleging that the Club terminated her in violation of public policy based on the FEHA discrimination claim. We also conclude, however, that the court properly granted summary adjudication of the FEHA claims alleging that the Club failed to accommodate Cornell's disability and retaliated against her and the claims alleging that the Club terminated her in violation of public policy based on the FEHA harassment and retaliation claims. Finally, we conclude that the court properly granted summary adjudication of the claim alleging that the Club intentionally inflicted emotional distress on Cornell but that a triable issue of material fact remains on the claim alleging that she was defamed.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.      *Cornell's Employment at the Club.*

Cornell has been obese since childhood and, as of May 2012, she was five feet, five inches tall and weighed over 350 pounds. Her body mass index is over 50, and she has been diagnosed as severely obese. Her weight interferes with several daily life functions, including bathing, walking, and using transportation. She cannot stand for more than an hour, cannot walk more than a mile at a time, and often experiences significant shortness of breath from engaging in basic activities.

The Club is member-owned and governed by a Board of Directors. It employs a general manager who oversees a small staff. At the time of most of the events giving rise to this case, Rigoberto Headley was the Club's general manager, Bruce Gurganus was the president of the Board and head of its Personnel Committee, and William Miller was the immediate past president and a member of the Board. Cornell's father is a longtime member of the Club.

Cornell began working part-time for the Club as a lifeguard and pool manager in 1997, while she was a college student at UC Berkeley. She eventually became a night manager and continued to work at the Club after graduating from college in 2001,

2

reporting to the Club's general manager. In 2011, she took on additional duties and began working about 40 hours a week as a night manager, day manager, and tennis court washer. She consistently received positive reviews, merit bonuses, and raises throughout this period.

### B. Cornell's Complaints After Headley Became General Manager.

#### 1. The Club's uniform policy.

Headley became the general manager of the Club in the spring of 2012. He told Cornell that "he wanted to change the image of the Club" and, in particular, wanted to require staff members to wear uniforms. That May, Cornell told Headley that finding a uniform that would fit her "might be an issue" because she normally shopped for clothes at specialty stores "due to [her] size." According to Cornell, Headley's "response was to laugh and in a mocking tone reply, 'Oh yeah, that's right.' " He later asked her "out of the blue" if she was thinking about having weight-loss surgery.

In mid-November 2012, Headley e-mailed Cornell to ask for her shirt size because he was ordering polo shirts for the staff uniforms. Cornell responded that she wore a women's size 5X to 7X, and she claims that she repeated this information to him "on at least a half dozen occasions."

At the end of December 2012, Headley notified the staff that the uniform shirts were available and required to be worn whenever a staff member was on a shift at the front desk. When Cornell went to pick up her shirts, the largest size available was 2X. The shirts did not fit her, and she felt "humiliated." She sought help from the Club's merchandising assistant, who told her that the shirts did not come in her size. At a Personnel Committee meeting the following March, Headley reported that all the staff had begun wearing the uniforms except for Cornell, who "continue[d] to resist this change and ha[d] not been cooperative."

Although Cornell was initially reluctant to bring up the issue with Headley, she wrote an e-mail to him later that March explaining that she could not wear the shirts he had ordered because they were five sizes too small. She expressed her desire to wear a uniform shirt and her hope that he could "understand [her] special needs/disabilities and

3

help in being accommodating." Headley responded that he would "work on providing an appropriate uniform shirt" because she was required to wear one, and he again asked her to provide her shirt size. It is unclear whether he attempted to find her a properly sized shirt: later that spring, without telling Headley, Cornell ordered shirts from a specialty shop at her own expense and had them embroidered with the Club logo.

2.     Cornell's hours, pay, and duties.

Before Headley was hired, Cornell had routinely acted as the day manager whenever the general manager and assistant general manager were out. After Headley was hired, Cornell asked him to continue to let her cover as the day manager when the position was available, but Headley often refused, assigning less experienced employees to fill the role and leaving her with fewer hours of work. Her scheduled hours, however, remained the same.

At the suggestion of the Club's retiring bookkeeper, Cornell offered to learn the Club's bookkeeping system, but Headley refused. In mid-November 2012, Cornell learned that the bookkeeping position had been offered to someone else. She believed "this was another incidence of discrimination" because she was denied the opportunity to apply for the position even though Headley knew she was interested in it, and the woman who was hired was "not obese." Headley claimed that he had directed Cornell to submit something in writing to indicate her interest, but she never did so, and he and the Board's Finance Committee hired an outside contractor with over 13 years of bookkeeping experience.

Soon afterward, Headley also hired Kristen Kayser, a college student whom Cornell characterized as "a small, very petite and thin woman," to work some night shifts. Cornell's hours were immediately reduced. In January 2013, while meeting with Headley to discuss her annual evaluation, Cornell complained that she was being discriminated against because Kayser was being paid $15 per hour, about a dollar more

4

per hour for the same night duties. According to Cornell, Headley responded that he had hired Kayser "because [Kayser] was 'a good fit.' "[2]

After Cornell spoke to Headley about the pay disparity, Lynne Rolley, the Club's tennis director, saw Cornell crying, and Cornell explained that she was upset Kayser was being paid more. Rolley approached Headley, who said that Cornell was "going to be very jealous of anybody else that works here." According to Rolley, when she told Headley she could understand why Cornell was upset about making less money, Headley responded, "[W]ell, just look at her, she's going to be jealous of anybody and she just isn't a good fit and I'm going to have to look for someone else." Rolley understood Headley to be referring to Cornell's size when he said "just look at her." After his conversation with Rolley, Headley offered to increase Cornell's night-shift pay rate to $16.50 per hour. Cornell responded that the raise was insufficient and that she felt she was being treated unfairly, but the raise eventually went into effect.

Later in January, Cornell wrote an e-mail to the Personnel Committee stating that it was unfair that she was being paid about $14 per hour at night as a 15-year employee and Kayser was being paid $15 per hour as a new employee. Cornell also requested that she be paid at a single rate of at least $20.50 per hour, which was in line with her pay rate for day shifts, and expressed her willingness to assume additional responsibilities. Gurganus responded, noting that the Personnel Committee had "discussed some of [her] issues" and directing her to talk to Headley, who "will refer any issues to the committee as he feels the need to do so."

A few days later, Cornell spoke to Gurganus in person and asked whether he knew that Kayser was being paid more than she was. He told Cornell "that he did not want to

---

[2] Headley testified that before this meeting he had prepared his written performance evaluation of Cornell. The evaluation was generally positive, praising her for her efficiency, interaction with Club members, and good attitude. "[T]o continue [Cornell's] effective performance," the evaluation suggested a number of "objectives," including that she "wear uniformed items (Name Tag and Staff Polo) while on duty." The evaluation concluded, "It continues to be a pleasure working with [Cornell] and we look forward to her continued success here at the Club."

hear anything more about this issue." The following day, Cornell responded to his e-mail and explained that she had approached the Personnel Committee because her "direct supervisors" had told her "to file a grievance regarding these issues" and she had hoped the Committee "could review and offer management some sort of solution or guidance that would be more in the spirit of the Berkeley Tennis Club."

C. *The May 2013 Board Meeting, Cornell's Termination, and the Alleged Defamation.*

A Board meeting with dinner service was held in a ballroom on the evening of May 21, 2013, during a weeklong tennis tournament that brought several hundred people to the Club. The meeting's agenda listed, among other things, "personnel issues" and "issues of club management," including "[r]ates of pay for staff."

Cornell and Headley both helped set up the ballroom for the Board meeting. Soon before the meeting began, Headley went to the ballroom for a final check and noticed that some additional cleaning was needed. He opened a portable bar to access cleaning supplies stored in it, and he saw a recording device on the top shelf. The recorder was in "the hold lock recording position" and apparently had been recording for several minutes. It was positioned only a few feet away from the table where the Board members were going to sit, and when Headley listened to the recording, he "heard footsteps walking away" and "what he thought were [Cornell's and Cornell's father's] voices a little later" talking about an unrelated matter.

Headley contacted Gurganus and explained what he had found. Headley was directed to put the recorder in a safe place, and he put it in his work bag. At the Board meeting, Gurganus revealed what Headley had discovered and said "it appeared that someone was trying to record [the] board meeting." Miller volunteered to hide on the ballroom's stage and see if anyone came to get the recorder after the meeting. Although Headley was present for part of the meeting, he claimed that he was not present when Miller disclosed this plan.

After the meeting was over, Miller sat on the stage and watched from behind a curtain as Headley and Cornell cleaned the ballroom. Miller then saw Cornell return to

6

the ballroom by herself. She approached the bar and reached around the back without looking inside it. After pulling the bar out from the stage, she bent over to look at the shelf where the recorder was found and reached inside the bar. She then left the ballroom. Miller reported what he had seen to Gurganus later that night.

Cornell admitted that she had looked inside the bar, but she claimed that she was looking for the cleaning supplies customarily kept there because she wanted to clean a table. According to her, she found only dirty rags inside the bar, so she decided to leave without cleaning the table because she was "really tired" and "frankly was done for the day." She denied planting a recorder in the ballroom or ever attempting to record a Board meeting.

According to Gurganus, he, Miller, and Headley spoke the next day, May 22, and decided "that it would be impossible for us to have somebody continue working at the . . . Club . . . who would surreptitiously record a board meeting." According to Headley, however, he did not participate in the decision to fire Cornell, which Gurganus told him the Board had reached. That afternoon, Headley, Gurganus, and Miller confronted Cornell about the recorder found in the ballroom. When prompted to explain why she looked inside the bar if she was not looking for the recorder, Cornell stated that she had been cleaning up after the Board meeting. Gurganus offered her the opportunity to resign instead of being fired, but she asked Headley for a termination letter. When he did not respond, she went to clean out her things.

Cornell's father appeared, and Cornell told him she had been accused of attempting to record the Board meeting and had been fired. He advised her "to ask them for proof, like the recorder." She then went to Headley's office and asked if she could see the recorder. According to Headley, the recorder had been in his bag at the Club earlier that day. Before the meeting with Cornell, he discovered that his bag had been opened and the recorder removed, even though his wallet and other valuable items had been left behind. When Cornell asked to see the recorder, Gurganus, who was also in Headley's office, said, " 'No, I'm not getting into this.' "

7

Gurganus and Headley then showed Cornell a resignation letter, but she refused to sign it and asked for a termination letter. Gurganus again asked her to resign, but after she refused, he said a termination letter would be mailed to her. Cornell left.

The next day, May 23, Headley received a letter from the office of an attorney, Judy Tsai (Tsai letter). The letter stated that he, Gurganus, and Miller had "falsely accuse[d] Ms. Cornell of planting a recording device at a board meeting," attempted to pressure Cornell into resigning, and engaged in other illegal conduct in terminating her. The letter closed by stating, "Please be advised that I am reviewing the sources of relief my client has available to her due to your conduct. Moreover, there are various causes of action stemming from Ms. Cornell's employment with [t]he . . . Club. If need be, this office is prepared to utilize every avenue of legal recourse to gain relief for my client. I will provide a demand letter to you in the next week prior to commencing litigation."

On May 25, Cornell's father e-mailed a copy of the Tsai letter to some Club members. He explained that he was doing so on the advice of his daughter's attorney and in response to members' queries about why his daughter had not been at the Club lately. In response to Cornell's father's e-mail, several Club members approached Gurganus and asked what had happened. Gurganus told at least some members that Cornell had been caught trying to tape the Board meeting and had violated the Penal Code. Similarly, Miller told several people, including Rolley, that Cornell was terminated because she had planted a recorder in an attempt to record the Board meeting, thereby committing a felony.[3]

### D.  *Procedural History.*

After filing an administrative complaint against the Club with the California Department of Fair Employment and Housing, Cornell received a right-to-sue letter. She filed this lawsuit in May 2014, asserting four causes of action for various Labor Code violations and the eight causes of action that are at issue in this appeal: (1) disability

---

[3] The Club concedes that such conduct constitutes a misdemeanor at most. (See Pen. Code, § 632 [electronic eavesdropping on confidential communications].)

discrimination/failure to accommodate under the FEHA; (2) wrongful discharge in violation of public policy based on the disability discrimination; (3) disability harassment under the FEHA; (4) wrongful discharge in violation of public policy based on the disability harassment; (5) retaliation under the FEHA; (6) wrongful discharge in violation of public policy based on the retaliation; (7) intentional infliction of emotional distress; and (8) defamation. The Club moved for summary adjudication of these eight claims, and the trial court granted the motion. After the remaining claims were voluntarily dismissed with prejudice, the court entered final judgment for the Club in December 2015.

## II.
### DISCUSSION

### A. *Standard of Review.*

The standard for reviewing a grant of summary adjudication is well-established. "A party is entitled to summary adjudication of a cause of action if there is no triable issue of material fact and the party is entitled to judgment as a matter of law." (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1154; Code Civ. Proc., § 437c, subds. (c), (f).) Generally, a defendant moving for summary adjudication must present evidence that either "conclusively negate[s] an element of the plaintiff's cause of action" or "show[s] that the plaintiff does not possess, and cannot reasonably obtain," evidence necessary to establish at least one element of the cause of action. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853-854 (*Aguilar*).) "If the [defendant] satisfies its initial burden, the burden shifts to the [plaintiff] to set forth 'specific facts' showing that a triable issue of material fact exists." (*Syngenta*, at p. 1155.)

We review the record de novo, "liberally construing the evidence in support of the party opposing summary [adjudication] and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) If summary adjudication was properly granted on any ground, we affirm "regardless of the trial court's stated reasons." (*Syngenta Crop Protection, Inc. v. Helliker, supra*, 138 Cal.App.4th at p. 1155.) Although summary judgment is no longer a disfavored

9

procedure, "many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper, . . . [and] rarely appropriate for disposition on summary judgment, however liberalized it be." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286 (*Nazir*).)

> B. *The FEHA Disability Discrimination and Harassment Claims Must Be Reinstated Because the Club Failed to Sustain Its Burden of Demonstrating that Cornell Cannot Establish that Her Obesity Has a Physiological Cause.*

Cornell claims that the trial court improperly granted summary adjudication of the FEHA disability discrimination/failure to accommodate and harassment claims. She argues that, contrary to the court's ruling, the Club failed to carry its initial burden of showing that she cannot demonstrate that her obesity constitutes a "physical disability" under the FEHA. We agree that the trial court improperly dismissed the discrimination and harassment claims, but we also conclude that it properly dismissed the failure-to-accommodate aspect of the discrimination claim.

> 1. The elements of Cornell's disability-based FEHA claims.

Under the FEHA, it is unlawful to discriminate against an employee on the basis of "physical disability." (Gov. Code, § 12940, subd. (a).)[4] Cornell's claim of disability discrimination is subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354; *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159 (*Wills*).) Under that framework, a plaintiff must first establish a prima facie case of discrimination by showing that " 'he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations[;] and (3) was subject to an adverse employment action because of the disability or perceived disability.' " (*Wills*, at pp. 159-160.)

Once the plaintiff establishes a prima facie case, " ' " 'the burden shifts to the defendant to [articulate a] legitimate nondiscriminatory reason for its employment

---

[4] All further statutory references are to the Government Code unless otherwise noted.

10

decision.' " ' " (*Wills, supra*, 195 Cal.App.4th at p. 160.)  If the defendant does so, "the burden again shifts to the plaintiff to establish the defendant intentionally discriminated against him or her.  [Citation.]  The plaintiff may satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for discrimination." (*Ibid.*)

The *McDonnell Douglas* burden-shifting framework was designed to apply to liability determinations at trial, not at the summary adjudication stage. (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 965.)  Thus, the framework does not affect the procedural rule, which we mentioned earlier, that imposes on a defendant the initial burden when that party seeks summary adjudication.  To satisfy this initial burden in an employment discrimination case, a defendant employer must either undermine an element of the plaintiff's prima facie case—by affirmatively negating it or showing the plaintiff cannot prove it—or provide a legitimate nondiscriminatory reason for the adverse employment action. (*Id.* at pp. 965-966; see *Aguilar, supra*, 25 Cal.4th at pp. 853-854.)

In addition to making it illegal to discriminate on the basis of disability, the FEHA makes it unlawful "to fail to make reasonable accommodation for the known physical . . . disability of an . . . employee." (§ 12940, subd. (m)(1).)  "The elements of a failure to accommodate claim are similar to the elements of a . . . section 12940, subdivision (a) discrimination claim, but there are important differences." (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 256.)  Although the first two elements are the same—that the plaintiff has a disability and can perform the essential duties of the job—the third element of a failure to accommodate claim is that "the employer failed to reasonably accommodate the plaintiff's disability." (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1192.)  "A reasonable accommodation is 'a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired.' " (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 971.)  Failure to accommodate claims are not subject to the *McDonnell Douglas* burden-shifting framework. (See *Weigel v. Target Stores* (7th Cir.

1997) 122 F.3d 461, 464 ["in failure to accommodate claims the *McDonnell Douglas* framework is 'unnecessary and inappropriate' "].)

Finally, the FEHA prohibits an employer from harassing an employee "because of . . . physical disability." (§ 12940, subd. (j)(1).) Cornell's claim of disability harassment requires a showing " 'that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [disability].' " (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 588, italics omitted.) The *McDonnell Douglas* burden-shifting framework does not apply to Cornell's harassment claim either. Since "there is no possible justification for harassment in the workplace," an employer cannot offer a legitimate nondiscriminatory reason for it. (*Phan v. CSK Auto, Inc.* (N.D. Cal., Aug. 27, 2012, No. 11-CV-02327 YGR, 2012 U.S. Dist. LEXIS 121457, at *31, fn. 11.)

The Club moved for summary adjudication of the discrimination/failure to accommodate claim and the harassment claim on the basis that Cornell's obesity is not a physical disability under the FEHA. The Club also contended that, even if Cornell has a condition protected by the FEHA, she did not require an accommodation and was not terminated for a discriminatory reason, and the Club's actions were not severe or pervasive enough to constitute harassment. The trial court ruled that these claims all failed because Cornell "ha[d] not presented medical evidence sufficient to create a triable issue of material fact as to whether she is disabled under the FEHA."

2. Cornell is required to demonstrate as an element of her disability-based FEHA claims that her obesity has a physiological cause.

Cornell maintains that she has an actual physical disability because her severe obesity is a "physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following: [¶] (A) Affects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine. [¶] (B) Limits a major life

12

activity." (§ 12926, subd. (m)(1).) Notably, she does not contend that she is covered by the FEHA because she was perceived as having a disability, even though the "FEHA protects individuals not only from discrimination based on an existing physical disability, but also from discrimination based on a potential disability or the employer's perception that the individual has an existing or potential disability." (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 584.)

In *Cassista v. Community Foods, Inc.* (1993) 5 Cal.4th 1050 (*Cassista*), the Supreme Court held "that weight may qualify as a protected 'handicap' or 'disability' within the meaning of the FEHA if medical evidence demonstrates that it results from a physiological condition affecting one or more of the basic bodily systems and limits a major life activity." (*Id.* at p. 1052.) Interpreting the same statutory language as currently found in section 12926, subdivision (m)(1)(A), and relying on federal antidiscrimination law for guidance, the Court concluded that "an individual who asserts a violation of the FEHA on the basis of his or her weight must adduce evidence of a physiological, systemic basis for the condition." (*Cassista*, at pp. 1063-1065.)

Cornell does not dispute that "*Cassista* remains the controlling authority" and that an element of her disability-based FEHA claims requires her to prove that her obesity has a physiological cause. She suggests, however, that the burden of demonstrating such a cause has been eased as a result of relatively recent developments in federal law. We take a moment to discuss these developments since California courts routinely look to decisions interpreting the federal Americans with Disabilities Act of 1990 (ADA; 42 U.S.C. § 12101 et seq.) for guidance in deciding FEHA cases. (See *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224, fn. 7.)

As does the FEHA, the ADA prohibits discrimination against people with physical disabilities. The California Legislature has declared that "[t]he law of this state in the area of disabilities provides protections independent from those in the [ADA]. Although the federal act provides a floor of protection, this state's law has always, even prior to passage of the federal act, afforded additional protections." (§ 12926.1, subd. (a).) Consistent with this principle, the FEHA provides that "if the definition of 'disability'

13

used in the [ADA] would result in a broader protection of the civil rights of individuals with a . . . physical disability, as defined in [subdivision (m) of section 12926], . . . then that broader protection or coverage shall be deemed incorporated by reference into, and shall prevail over conflicting provisions of, the definition[] in [subdivision (m)]." (§ 12926, subd. (n).)

Numerous federal decisions have held, consistent with *Cassista*, that obesity does not qualify as a disability under the ADA unless it has a physiological cause.[5]  (See *Morriss v. BNSF Railway Co.* (8th Cir. 2016) 817 F.3d 1104, 1108-1111 [collecting cases].)  In 2008, Congress passed the ADA Amendments Act (ADAAA), which emphasized that the definition of "disability" is to "be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by [its] terms." (Pub. L. No. 110-325 (Sept. 25, 2008) 122 Stat. 3553, 3555.)  Cornell points out that in response, the U.S. Equal Employment Opportunity Commission (EEOC) revised its regulations to remove language, which *Cassista* had cited, providing that " 'except in rare circumstances, obesity is not considered a disabling impairment.' "[6]  (*Cassista,*

---

[5] Although widely accepted, the physiological-cause requirement has been powerfully criticized.  (See, e.g., Jane Korn, *Too Fat* (2010) 17 Va. J. Soc. Pol'y & L. 209, 246 ["If no proof of causation is required for other physiological conditions for which we might lay blame, it is time to stop imposing moral failure on people who are obese"].)

[6] Cornell also cites a decision in which a federal district court concluded that severe obesity is a disability under the ADA even if it does not have a physiological basis. (*EEOC v. Resources for Human Development, Inc.* (E.D. La. 2011) 827 F.Supp.2d 688, 694-695; see also *BNSF Railway Co. v. Feit* (Mont. 2012) 281 P.3d 225, 229-230.) The district court relied on a portion of the EEOC's Compliance Manual stating that " '[b]eing overweight, in and of itself, is not generally an impairment . . . [.]  On the other hand, severe obesity, which has been defined as body weight more than 100% over the norm, is clearly an impairment.' " (*Resources for Human Development*, at p. 694, citing EEOC Compliance Manual § 902.2(c)(5).)  The Eighth Circuit Court of Appeals has determined, however, "that this Compliance Manual pronouncement directly contradicts the plain language of the [ADA], as well as the EEOC's own regulations and interpretive guidance" (*Morriss v. BNSF Railway Co., supra*, 817 F.3d at p. 1112), and in any event it has since been removed from the EEOC's website because the ADAAA "superseded" its analysis. (http://www.eeoc.gov/policy/docs/902cm.html (last visited Dec. 21, 2017).)

14

*supra*, 5 Cal.4th at p. 1065, quoting former 29 C.F.R. appen. § 1630.2(j) (1992); compare 29 C.F.R. § 1630.2 [language removed].) We agree with Cornell that even though *Cassista* requires her to show that her obesity has a physiological cause, these developments suggest an easing of the burdens associated with satisfying the requirement under the ADA, and by extension the FEHA. With this in mind, we turn to discuss whether the Club satisfied its initial burden of demonstrating that Cornell cannot establish that her obesity has a physiological cause.

       3.     The Club did not carry its initial burden of demonstrating that Cornell cannot establish that her obesity has a physiological cause.

We agree with Cornell that the Club failed to meet its initial burden of demonstrating that she cannot establish that her obesity is an actual disability under the FEHA.[7] As a result, we need not resolve her claim that the trial court erred by excluding certain expert evidence she proffered to create a triable issue of material fact on whether her obesity has a physiological cause.[8]

In moving for summary adjudication of the disability-based claims, the Club presented no scientific or expert evidence that Cornell's obesity lacks a physiological cause. Instead, it tried to satisfy its initial burden by relying on three other sources of evidence: Cornell's deposition testimony, the deposition testimony of Cornell's primary-care physician, Marie Stella Pierre, M.D., and Cornell's discovery responses. In opposing the Club's motion for summary adjudication, Cornell submitted a declaration from Paul Fitzgerald, M.D. Based on his review of Cornell's medical records and declaration, Dr. Fitzgerald opined that her severe obesity "is more likely than not caused by a genetic condition affecting metabolism." At the hearing on the motion, Cornell

---

[7] Cornell filed a request for judicial notice of a report of the Center for Disease Control that she contends contains data that is "highly relevant on the issue of whether [her] body weight is 'more than 100% over the norm' per the EEOC's stated position." We deny the request because the report is unnecessary to our decision.

[8] Nor do we address whether Cornell was required to plead a physiological cause for her obesity, as the Club states that the supposed pleading defect was merely "one of many factors" supporting its motion for summary adjudication and not determinative.

15

requested, but was denied, a continuance under Code of Civil Procedure 437c, subdivision (h) to allow her to submit a supplemental declaration from Dr. Fitzgerald.

The trial court ruled that Cornell had "not presented medical evidence sufficient to create a triable issue of material fact as to whether she is disabled under the FEHA." It concluded that Dr. Fitzgerald's opinions about the cause of Cornell's obesity were inadmissible because they lacked foundation and were conclusory. It also determined that Cornell and Dr. Pierre failed to identify a cause for Cornell's obesity in their testimony. In doing so, the court suggested that Cornell's testimony that other doctors had said her obesity was genetic was insufficient because she had "not had any genetic testing related to her obesity." Although the court also mentioned in passing that the Club had "met its initial burden of showing there is no evidence to support [Cornell's] claim that her severe obesity qualifies as a disability under the FEHA," it did not explain that conclusion.

Under *Aguilar*, to meet its initial burden in moving for summary adjudication the Club was required to either present evidence disproving that Cornell's obesity has a physiological cause or demonstrate that Cornell "does not possess, and cannot reasonably obtain," evidence of a physiological cause. (*Aguilar, supra*, 25 Cal.4th at p. 854.) The Club effectively agrees that it did not present evidence that negated the disability element of Cornell's claims: it did not present its own expert evidence that Cornell's obesity does not have a physiological cause or identify any evidence affirmatively establishing that such a cause is lacking. Therefore, in determining whether the Club met its initial burden, we focus on whether it presented evidence that Cornell does not possess, and cannot reasonably obtain, evidence that her obesity has a physiological cause.

Whether a plaintiff has or can obtain evidence of causation for purposes of withstanding a motion for summary adjudication sometimes arises in asbestos cases. In *Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433 (*Weber*), this division addressed such a question. (*Id.* at pp. 1438-1439.) In his deposition, the injured plaintiff testified that he could not remember whether he had worked around a product manufactured by the defendant, Crane. (*Id.* at p. 1439.) We concluded that this testimony "suggest[ed]

16

only that [the] plaintiffs will not be able to prove their case with [the injured plaintiff's] testimony" and did not support an inference that the injured plaintiff would be unable to recognize Crane products if he saw them or that no other evidence tying Crane products to his jobsite existed. (*Ibid.*) Thus, his testimony "simply [did] not create an inference either of nonexposure or of the inability to prove exposure by some other means." (*Ibid.*) In concluding that summary judgment should have been denied, we distinguished other cases, including *Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96 (*Andrews*), in which, in addition to not being able to recall whether they were exposed to a defendant's asbestos products, plaintiffs provided "nonresponsive answers to comprehensive special interrogatories designed to elicit information about . . . [such] exposure to the defendant's products" or testified that they *could* recall other products at their worksites, permitting the inference that the defendant's products were not present. (*Weber*, at pp. 1440-1442.)

Guided by this authority, we conclude that none of the three sources of evidence that the Club identified in its motion for summary adjudication support the conclusion that Cornell did not have and could not reasonably obtain evidence that her obesity has a physiological cause. We discuss each source in turn.

a. Cornell's deposition testimony.

In her deposition, Cornell identified three doctors by name, including her current treating physician, Dr. Pierre, who had told her that her obesity is genetic. The Club claims that this testimony was insufficient to support her claims because it was hearsay and the Club "objected to consideration of [it] accordingly." What the Club does not say, however, is that the trial court overruled the objection, and the Club does not argue that the ruling should be overturned on appeal. As a result, we consider this testimony.

The Club argues that "[b]ecause Cornell did not assert a claim for medical-condition discrimination, whether she had a genetic characteristic that caused her obesity is irrelevant." The FEHA prohibits discrimination on the basis of a plaintiff's "medical condition" as well as disability. (§ 12940, subd. (a).) "Medical condition" is defined as meaning either (1) "[a]ny health impairment related to or associated with a diagnosis of

17

cancer or a record or history of cancer" or (2) "[g]enetic characteristics."[9]  (§ 12926, subd. (i).)  We agree that Cornell has not asserted a medical-condition claim, and we therefore do not consider whether her contention that her obesity has a genetic cause would qualify her for protection from discrimination based on a medical condition.

We do not agree, however, that just because "genetic characteristics" as defined constitute a medical condition means that obesity with a genetic cause cannot qualify as an actual physical disability.  There is nothing in the statutory language to suggest that a claim for medical-condition discrimination is the exclusive remedy for discrimination based on a disability with a genetic component.  Rather, the pertinent question is whether a genetic cause qualifies as a "physiological cause."  "Physiological" means "relating to the functioning of living organisms."  (Oxford English Dict. Online (3d ed. Mar. 2006) <http://www.oed.com> [as of Dec. 21, 2017 [physiological].)  This term encompasses genetics, and the Club does not argue otherwise.  We therefore reject the implication that Cornell cannot establish her claim by proving that her obesity has a genetic cause.

The Club also argues, and the trial court agreed, that the fact Cornell had not undergone genetic testing "undermined her assertion that her obesity was caused by a genetic condition."  We are not persuaded.  The Club points to no evidence in the record that genetic testing can confirm that a particular person's obesity is genetic or, if it can, that such testing is the only way of proving a genetic cause.  Moreover, even if genetic testing were the only way to confirm that obesity is genetic, the fact that Cornell had not been tested does not permit the inferences that she could not be tested or would obtain

_____

[9] "Genetic characteristics," in turn, are defined as either (1) "[a]ny scientifically or medically identifiable gene or chromosome, or combination or alteration thereof, that is known to be a cause of a disease or disorder in a person or his or her offspring, or that is determined to be associated with a statistically increased risk of development of a disease or disorder, and that is presently not associated with any symptoms of any disease or disorder" or (2) "[i]nherited characteristics that may derive from the individual or family member, that are known to be a cause of a disease or disorder in a person or his or her offspring, or that are determined to be associated with a statistically increased risk of development of a disease or disorder, and that are presently not associated with any symptoms of any disease or disorder."  (§ 12926, subd. (i)(2).)

18

negative results if she were tested. (See *Weber, supra*, 143 Cal.App.4th at p. 1439.) In short, Cornell's deposition testimony does little to help the Club satisfy its initial burden in moving for summary adjudication.

### b. Dr. Pierre's deposition testimony.

In addition, the Club relied on the testimony of Dr. Pierre that she diagnosed Cornell with severe obesity based solely on Cornell's body mass index, never assessed the cause of Cornell's obesity, and did not diagnose any "secondary condition" that may have caused Cornell's obesity. The Club also pointed out that Dr. Pierre advised Cornell to lose weight and Cornell had indicated it was difficult to find the motivation to do so.

This evidence does not necessarily support the conclusion that Cornell did not have and could not reasonably obtain evidence that her obesity has a physiological cause. On appeal, the Club focuses on Dr. Pierre's failure to diagnose a secondary condition that may have caused Cornell's obesity. But Dr. Pierre had no reason to assess whether Cornell's condition has a physiological cause because she could and did visually diagnose Cornell's obesity based on body mass index alone. Thus, Dr. Pierre's testimony does not establish that Cornell cannot prove such a cause exists.

Moreover, the other two doctors Cornell identified as having told her that her obesity was genetic were apparently never deposed. Even if Dr. Pierre's testimony permitted the inference that Cornell's obesity does not have a physiological cause, the Club's failure to demonstrate that the other two doctors could not in fact identify such a cause left unrebutted Cornell's assertion that those doctors determined her obesity to be genetic.[10]

### c. Cornell's discovery responses.

Finally, the Club relied on Cornell's allegedly "factually devoid responses" to four interrogatories that it claims fairly requested evidence that her obesity has a physiological

---

[10] Dr. Fitzgerald, Cornell's expert, also opined that her obesity has a physiological cause. Although we need not resolve whether the trial court erred in its evidentiary rulings on his declarations, this evidence also tends to suggest that Cornell might be able to prove such a cause at trial.

cause.  The responses on which the Club relies were to form employment interrogatories requesting that Cornell (1) "identify each characteristic (for example, gender, race, age, etc.)" and "state all facts" on which she based her discrimination claim; (2) "identify each characteristic (for example, gender, race, age, etc.)" and "state all facts" on which she based her harassment claim; (3) "state all facts" on which she based her claims of wrongful discharge in violation of public policy; and (4) "[n]ame and describe each disability alleged."  In response to the first interrogatory, Cornell identified the characteristic on which she based her claims as "[d]isability – obesity" and gave a detailed, four-page recitation of the Club's allegedly unlawful behavior.  She incorporated that response in her responses to the second and third interrogatories.  Finally, she responded "[o]besity" to the fourth interrogatory.  She later submitted amended responses that described in more detail the facts underlying her harassment and wrongful-discharge claims but continued to state her disability is "obesity."

"If plaintiffs respond to comprehensive interrogatories seeking all known facts with boilerplate answers that restate their allegations, or simply provide laundry lists of people and/or documents, the burden of production will almost certainly be shifted to them once defendants move for summary judgment and properly present plaintiffs' factually devoid discovery responses."  (*Andrews, supra*, 138 Cal.App.4th at p. 107.)  In *Andrews*, the defendant "propounded a series of special interrogatories which called for all facts regarding [the injured plaintiff's] exposure to asbestos from [the defendant's] products."  (*Id.* at pp. 99, 104.)  In response, the plaintiffs stated that the injured plaintiff had been exposed to the defendant's products " 'during his working career' " and listed all his jobsite locations, duties, and dates of employment.  (*Id.* at p. 104.)  The plaintiffs also stated " 'that they ha[d] no further information responsive' " to the interrogatories.  (*Id.* at p. 105.)  *Andrews* concluded that the responses constituted "little more than general allegations against [the defendant] and [did] not state specific facts showing that [the injured plaintiff] was actually exposed to asbestos-containing material from [the defendant's] products" and that the defendant had therefore carried its initial burden in moving for summary judgment.  (*Id.* at pp. 104, 107.)

20

Cornell's responses to the first three interrogatories do not demonstrate that she lacked evidence to establish that her obesity has a physiological cause. The requests that she "identify each characteristic (for example, gender, race, age, etc.)" and "state all facts" on which her claims were based arguably did not call for more than a brief identification of her claimed disability. Her responses to these interrogatories, which otherwise provided a detailed recitation of the facts underlying her claims, are not "factually devoid" merely because she did not give further details about her condition. (Compare *Andrews, supra*, 138 Cal.App.4th at p. 104.) Since the Club well knew that a physiological cause is required under *Cassista*, it could have propounded a follow-up interrogatory or moved to compel a further answer.

The fourth interrogatory, asking Cornell to "[n]ame and describe each disability alleged," arguably called for a more detailed description of Cornell's obesity and came close to requiring the identification of any physiological cause. Again, however, the Club never expressly asked about such a cause or otherwise referred to *Cassista*'s requirements, and the Club's "failure to ask more pointed and specific questions does not establish an absence of evidence." (*Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 244.) In addition, although Cornell responded that her disability was "[o]besity" without providing any further details, she also objected to the interrogatory on a number of grounds, including that it called for expert opinion. The Club could have sought to compel a further answer, which would have squarely raised *Cassista*, but the trial court was never asked to consider whether Cornell's responses or objections to any of the four interrogatories were sound. We are left with a record that was never fully fleshed out during discovery through more specific interrogatories or depositions of all three doctors who told Cornell her obesity is genetic.

Therefore, we conclude that the Club did not meet its initial burden by pointing to Cornell's deposition, Dr. Pierre's deposition, or the interrogatory responses. As a result, the trial court erred by granting summary adjudication of Cornell's disability-based FEHA claims on the ground that evidence of a physiological cause for her obesity was

21

lacking. Accordingly, we turn to consider whether summary adjudication of those claims was nevertheless proper based on their other elements.

>     4.     Summary adjudication of Cornell's discrimination/failure to accommodate claim must be reversed in part.

As we have mentioned, the discrimination/failure to accommodate claim alleged both that Cornell was terminated because of her obesity and that the Club failed to provide a reasonable accommodation. We conclude that summary adjudication of the claim was improper as to the allegations of discriminatory termination but proper as to the allegations of a failure to accommodate.

>     a.     Discriminatory termination.

As to the portion of her claim based on an adverse employment action, Cornell concedes that the Club satisfied its burden of identifying a legitimate nondiscriminatory reason for terminating her—that she planted the recorder—but argues that she presented sufficient evidence to create a triable issue of material fact as to whether this reason was pretextual.[11] We agree.

Cornell maintains that "a reasonable factfinder [could] conclude that [the Club] was not truly motivated by" the belief that she planted the recorder. In doing so, she properly recognizes that the issue is not whether she actually planted the recorder but whether the Club honestly believed that she did so. (See *Wills, supra*, 195 Cal.App.4th at pp. 171-172; *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 436.) Because "[p]roof of discriminatory intent often depends on inferences rather than direct evidence[,] . . . 'very little evidence of such intent is necessary to defeat summary judgment.' " (*Nazir, supra*, 178 Cal.App.4th at p. 283.)

Cornell argues that it was "highly implausible that [the Club] genuinely concluded [she] planted the recording device simply because she returned to the ballroom and, in the

---

[11] It is undisputed that Cornell established the other elements of a prima facie case of discrimination: that she could perform her job's essential duties with or without a reasonable accommodation and that she was subject to an adverse employment action. (See *Wills, supra*, 195 Cal.App.4th at pp. 159-160.)

process of cleaning, reached into the portable bar," as her duties included cleaning, the cleaning supplies were kept in the bar, and there is evidence that both Gurganus and Miller knew that. We disagree that such a conclusion was highly implausible, and we agree with the Club that Gurganus and Miller could have reasonably believed that Cornell planted the recorder. But we also conclude that there is a triable issue as to whether they actually held that belief. There is evidence that both men knew that Cornell had a legitimate reason for looking into the bar, and a factfinder could therefore conclude that the men did not actually believe she planted the recorder—particularly since they never fully questioned her about the incident or performed a follow-up investigation. (See *Nazir, supra*, 178 Cal.App.4th at p. 280 ["[a]n employer's failure to interview witnesses for potentially exculpatory information evidences pretext"].)

We recognize that "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons" for an adverse employment action. (*Guz v. Bechtel National, Inc., supra*, 24 Cal.4th at p. 360.) Though such evidence "may 'considerably assist' a circumstantial case of discrimination, . . . there must [also] be evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the [FEHA], was the true cause of the employer's actions." (*Id.* at p. 361, italics omitted.) We conclude that evidence that Headley harbored a discriminatory animus toward Cornell and was involved in her termination satisfies this requirement.

Initially, we tend to agree with the Club that the theory that Headley set up Cornell to be fired for planting the recorder is unlikely to be true. When Headley revealed that he had found the recorder, he did not accuse *Cornell* of planting it, and there is no evidence that Gurganus or Miller came to believe she was responsible before Miller hid to see if anyone came back to retrieve the recorder. Cornell disputes Headley's contention that he was unaware of Miller's plan to hide and see who came to retrieve the recorder, but there is no evidence that Headley suggested the plan to Miller. In addition, Cornell points out that Headley stated he heard her and her father's voices on the recording, but he did not claim that the two spoke about anything incriminating or that they were recorded right

23

after he heard the footsteps. Therefore, it is far from apparent how Headley could reasonably anticipate that Cornell would be suspected of planting the recorder based on his report to Gurganus.

But even assuming that Headley did not orchestrate the discovery of the recorder, there is still a basis to conclude that his discriminatory animus toward Cornell influenced the ultimate decision to terminate her. "[S]howing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.) There is evidence that Headley made several comments suggesting he held a discriminatory animus toward Cornell. Although the extent to which he participated with Gurganus and Miller in the decision to fire Cornell is unclear, there is plenty of evidence that he participated in some way, as he discussed the recorder incident with them at length and was present the following day when Cornell was terminated. Indeed, the Club does not argue that Headley's discriminatory animus cannot be imputed to it.

Instead, the Club argues that the same-actor inference defeats the conclusion that Headley had a discriminatory intent. This inference arises " 'where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time.' " (*Coghlan v. Am. Seafoods Co. LLC* (9th Cir. 2005) 413 F.3d 1090, 1096.) According to the Club, the fact that Headley gave Cornell a positive performance review five months before her termination " 'is very strong evidence that [he held] no discriminatory animus, and [Cornell] must present correspondingly stronger evidence of bias in order to prevail.' " (Quoting *id.* at p. 1096, fn. 10.) But we attach less significance to the performance evaluation than does the Club, since it was given to Cornell several months before she was actually terminated and Headley prepared it before issues arose about the uniform policy and Cornell's pay.

Moreover, as the Second District Court of Appeal recently observed, "[w]hile once commonly relied on by courts affirming summary judgment against a plaintiff alleging discriminatory action, the same-actor inference has lost some of its persuasive

24

appeal in recent years." (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1188.) In particular, Division Two of this District has held that the inference should not "have some undue importance attached to it, for that could threaten to undermine the right to a jury trial by improperly easing the burden on employers in summary judgment." (*Nazir, supra*, 178 Cal.App.4th at p. 273.) Thus, even if we were otherwise inclined to view the performance evaluation as evidence that Headley lacked discriminatory animus, recent case law suggests that it is not entitled to great weight.

In sum, we conclude that the evidence that the Club's proffered reason for terminating Cornell was false, combined with the evidence that Headley harbored a discriminatory animus against her and participated in the decision to terminate her, suffices to create a triable issue of material fact as to whether the Club intentionally discriminated against her. As a result, the claim for disability discrimination based on her termination should not have been dismissed.

b. Failure to accommodate.

Turning to the other aspect of Cornell's discrimination claim, we agree with the Club that it did not have a duty to accommodate her obesity. Under section 12940, subdivision (m), an employer is required "to accommodate only a '*known* physical . . . disability,' " and "[t]he employee bears the burden of giving the employer notice of his or her disability." (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1252.) "[A]n employer 'knows an employee has a disability when the employee tells the employer about his [or her] condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation.' " (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 887.) "The employer need only know the underlying facts, not the legal significance of those facts" (*ibid.*), and " ' "[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the [FEHA]." ' " (*Avila*, at p. 1248.) In other words, so long as the employer is aware of the employee's condition, there is no requirement that the employer be aware that the condition is considered a disability under

25

the FEHA. (*Faust*, at p. 887.) By the same token, it is insufficient to tell the employer merely that one is disabled or requires an accommodation. (*Avila*, at p. 1248.)

Although the Club concededly was aware of Cornell's obesity, it argues that under *Cassista* it had to be aware that Cornell's obesity has a physiological cause. It relies on a portion of *Cassista* addressing whether, having failed to establish her obesity had a physiological cause, the plaintiff was nevertheless entitled to protection under the FEHA because she was regarded as having a disability. (*Cassista, supra*, 5 Cal.4th at p. 1065.) *Cassista* interpreted a regulation providing that a person is disabled if he or she " '[i]s regarded as having [a covered] physical handicap' " and held it required that the employer not just perceive the plaintiff as obese but also perceive the plaintiff's weight as having a physiological cause. (*Id.* at pp. 1065-1066, quoting former Cal. Code Regs., tit. 2, § 7293.6, subd. (i).)

Of course, as Cornell points out, *Cassista* did not address an employer's duty to accommodate under the FEHA. She fails to convince us, however, that *Cassista*'s reasoning is therefore inapplicable in determining which facts an employer must know in order for its duty to accommodate to be triggered by a plaintiff's obesity. The issues whether an employer perceives a plaintiff as disabled and whether an employer is aware of a plaintiff's disability are similar, and we conclude it is appropriate to look to *Cassista* for guidance in resolving whether Cornell's failure to accommodate claim requires a showing that the Club was on notice that her obesity has a physiological cause.

Subsequent statutory changes have affected *Cassista*'s holding that a plaintiff's obesity does not qualify as a perceived disability unless the employer believes the condition has a physiological cause. There is no longer any requirement that a plaintiff be perceived as having an *actual* disability under the FEHA to qualify as disabled based on the employer's perceptions. Section 12926 now defines "physical disability" to include "[b]eing regarded or treated by the employer . . . as having, or having had" not only a condition "that has no present disabling effect but may become [an actual] physical disability" under subdivision (m)(1) but also "any physical condition that makes achievement of a major life activity difficult." (§ 12926, subd. (m)(4)-(5).) Thus,

26

*Cassista* does not compel the conclusion that an employer must perceive a plaintiff's obesity as having a physiological cause in order for the obesity to qualify as a perceived disability under the FEHA—much less that, by extension, an employer must be aware that a plaintiff's obesity has a physiological cause to be required to accommodate that condition. (See *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 60 [employers have duty to provide reasonable accommodation for applicants or employees " 'regarded as' disabled," not just those with actual disabilities].)

This conclusion does not help Cornell, however, because she claims she was entitled to a reasonable accommodation because her obesity is an actual disability, not because of how the Club perceived it.[12] Thus, *Cassista*'s reasoning applies, and it supports the conclusion that, where a plaintiff claims that his or her obesity is an actual disability, an employer must be aware that the obesity has an underlying physiological cause to have a duty to provide a reasonable accommodation. Since Cornell does not dispute that the Club was unaware that her obesity might have such a cause, we conclude that on remand she may not pursue the failure to accommodate aspect of the discrimination/failure to accommodate claim.

> 5. Summary adjudication of the harassment claim must also be reversed.

The Club argues that even if Cornell is otherwise entitled to protection under the FEHA, summary adjudication of her disability harassment claim was proper because she was not subject to sufficiently severe or pervasive harassment. We disagree.

Actionable harassment consists of more than "annoying or 'merely offensive' comments in the workplace," and it cannot be "occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature." (*Lyle v. Warner Brothers Television Productions* (2006)

---

[12] Therefore, just as we have not addressed whether her obesity might qualify Cornell for protection under the FEHA based on anything other than her having an actual disability under section 12926, subdivision (m)(1), we do not address whether the Club was aware of her need for an accommodation because it regarded her as disabled even if it did not have notice of an actual disability.

38 Cal.4th 264, 283.)  Whether the harassment is sufficiently severe or pervasive to create a hostile work environment "must be assessed from the 'perspective of a reasonable person belonging to [same protected class as] the plaintiff.' " (*Nazir, supra*, 178 Cal.App.4th at pp. 263-264.)  In making this assessment, we consider several factors, including " 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1378.)

The specific statements by Headley that Cornell relied on below in claiming she was harassed are as follows.  First, in May 2012, after Cornell reported that it might be a problem to get a properly sized uniform for her because she shopped in specialty stores, Headley responded by laughing and mockingly saying, " 'Oh yeah, that's right.' "  Second, in November 2012, he asked her whether she had thought about having weight-loss surgery.  Finally, she once heard him tell the kitchen staff not to give her extra food because " 'she doesn't need it' " and once told her that she did not " 'need to eat that.' "

Standing alone, these comments were neither sufficiently severe nor sufficiently pervasive to support a FEHA harassment claim.  Although we agree with the trial court that the comments were "hurtful," and they certainly suggested that Headley held a negative view of Cornell's obesity and thought Cornell should lose weight, they were not explicitly derogatory or threatening.  "[W]hen the harassing conduct is not severe in the extreme, more than a few isolated incidents must have occurred to prove a claim based on working conditions." (*Lyle v. Warner Brothers Television Productions, supra*, 38 Cal.4th at p. 284.)  Four comments over several months does not establish a pattern of routine harassment creating a hostile work environment, particularly given that the comments were not extreme.

Still, we agree with Cornell that Headley's comments "must be viewed in context with [the Club's] other [allegedly] harassing conduct," including his ordering of shirts that were significantly too small for her and reporting to the Personnel Committee that she was resisting the uniform policy by not wearing appropriate shirts, as well paying her

28

less than another employee and denying her extra hours and internal job openings. In *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, the Supreme Court explained that FEHA discrimination claims involve "explicit changes in the 'terms, conditions, or privileges of employment' [citation]; that is, changes involving some official action taken by the employer," and FEHA harassment claims involve "situations in which the social environment of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Id.* at p. 706, italics omitted.) While the two kinds of claims are distinct, "some official employment actions done in furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message" and thus also support a harassment claim. (*Id.* at p. 709.)

Although we consider it a close call, we conclude that summary adjudication of the harassment claim must be reversed. Many of Headley's official actions can be interpreted as enforcing the negative weight-based message his comments conveyed. Liberally construing the evidence in her favor, as we must, we conclude that Cornell satisfied her burden to demonstrate a triable issue of material fact as to whether the harassment was sufficiently severe or pervasive, based on Headley's actions in combination with his comments communicating an offensive weight-based message.

### C. *Summary Adjudication of the Retaliation Claim Was Proper.*

Cornell contends that the trial court erred by granting summary adjudication of her retaliation claim because she suffered adverse employment consequences after engaging in the protected activity of asking for a reasonable accommodation and complaining about discriminatory treatment. We conclude that the court properly dismissed the claim.

It is unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [the FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [the FEHA]." (§ 12940, subd. (h).) "[T]he elements of such a claim are substantially the same as those for disparate treatment except that instead of having to show that the action was motivated by animus toward the plaintiff as a member of the

29

protected class, the plaintiff must show that the motive was retaliatory animus." (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 987-988.)

Like FEHA discrimination claims, FEHA retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework. (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 244 (*Moore*).) "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) If the plaintiff establishes a prima facie case, the burden shifts to the employer to identify "a legitimate, nonretaliatory reason for the adverse employment action." (*Ibid.*) The burden then "shifts back to the employee to prove intentional retaliation." (*Ibid.*)

The Club moved for summary adjudication of the retaliation claim on the same grounds as it moved for summary adjudication of the discrimination claim: that Cornell's obesity is not an actual disability under the FEHA and that neither her termination nor any other purported adverse action occurred "because of" her obesity. The trial court ruled that Cornell had failed to demonstrate that she engaged in a protected activity because under then-existing law, a request for a reasonable accommodation did not constitute protected activity.

Cornell contends that the trial court erred by relying on *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635 (*Rope*) in ruling that a request for a reasonable accommodation does not constitute protected activity. As we have said, it is unlawful for an employer "to fail to make reasonable accommodation for the known physical . . . disability of an . . . employee." (§ 12940, subd. (m)(1).) *Rope* held that "a mere request—or even repeated requests—for an accommodation, without more," cannot support a FEHA retaliation claim. (*Rope*, at pp. 652-653.)

In 2015, well after the events at issue here, the Legislature amended section 12940 to add subdivision (m)(2), which now makes it unlawful for an employer to "retaliate or otherwise discriminate against a person for requesting accommodation under this

subdivision, regardless of whether the request was granted." (Stats. 2015, ch. 122, § 2.) In the preamble to the bill, the Legislature stated, "Notwithstanding any interpretation of this issue in *Rope* . . ., the Legislature intends (1) to make clear that a request for reasonable accommodation on the basis of . . . disability is a protected activity, and (2) by enacting paragraph (2) of subdivision (m) . . . of Section 12940, to provide protection against retaliation when an individual makes a request for reasonable accommodation under these sections, regardless of whether the request was granted." (Stats. 2015, ch. 122, § 1, subd. (d).)

"Statutes operate prospectively unless they contain an express retroactivity provision, or it is ' "very clear" ' that the Legislature intended the statute to operate retroactively." (*Moore, supra*, 248 Cal.App.4th at p. 246, italics omitted.) A retroactivity analysis is unnecessary, however, if " ' "[a] statute . . . merely clarifies, rather than changes, existing law . . ." "because the true meaning of the statute remains the same" ' " and therefore applies to events predating the statute's enactment. (*Ibid.*, italics omitted.) In determining whether a statute merely clarifies existing law, a court first determines whether our state "Supreme Court has 'finally and definitively' interpreted" the former version of the statute, in which case "the Legislature is without power to state that a later amendment is simply declarative of existing law if the declaration of that existing law is contrary to the Supreme Court's interpretation." (*Ibid.*) But where, as here, the Supreme Court has provided no such interpretation, a court must " 'look[] to "all pertinent circumstances and considerations in deciding whether an amendment is a modification or clarification of a statute," ' " including the Legislature's views of the matter. (*Ibid.*) " '[P]articularly when there is no definitive "clarifying" expression by the Legislature in the amendments themselves, [a court] will presume that a substantial or material statutory change . . . bespeaks legislative intention to change, and not just clarify, the law.' " (*Id.* at pp. 246-247.)

Cornell argues that section 12940, subdivision (m)(2) applies because it merely clarified existing law. *Moore* squarely rejected this argument, holding that the 2015 amendment changed, not clarified, existing law, and that it operates prospectively.

31

(*Moore, supra*, 248 Cal.App.4th at p. 247.) In determining that the amendment changed existing law, *Moore* pointed to the facts that the Legislature: (1) did not include a statement that it was merely clarifying existing law; (2) said it intended " 'to *provide* protection against retaliation,' " an unnecessary statement if such protection already existed; and (3) did not change the general retaliation provision, section 12940, subdivision (h), but instead added language to the provision addressing reasonable accommodations for disabilities. (*Moore*, at p. 247, quoting Stats. 2015, ch. 122, § 1, subd. (d), italics added.)

Cornell does not even address *Moore*, which the Club cited in its brief, much less provide us with a reason not to follow it. She argues that the 2015 amendment merely clarified existing law because the Legislature stated that it "intend[ed] . . . to *make clear* that a request for reasonable accommodation on the basis of . . . disability is a protected activity." (Stats. 2015, ch. 122, § 1, subd. (d), italics added.) We do not consider the use of the word "clear" in this context to be a " 'definitive "clarifying" expression by the Legislature,' " however, especially because in the next breath the Legislature said it intended to "provide" protection against retaliation. (*Moore, supra*, 248 Cal.App.4th at pp. 246-247.) In light of the other circumstances *Moore* identified as suggesting that the amendment changed the law, we agree that section 12940, subdivision (m)(2) does not apply to acts occurring before the amendment took effect. Thus, it does not apply here.

Finally, Cornell argues that even if a request for an accommodation was insufficient to establish she engaged in protected activity, she presented evidence that she engaged in a separate kind of protected activity by complaining to both Headley and the Personnel Committee that she considered the difference between her and Kayser's pay to be "discriminatory." Cornell never argued below, however, that these complaints constituted protected activity supporting a retaliation claim. "A party may not for the first time on appeal change its theory of relief." (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 427, fn. 20.) We conclude she has forfeited this argument, and she therefore cannot demonstrate that the trial court erred by granting summary adjudication of the retaliation claim.

### D. One of the Claims for Wrongful Discharge in Violation of Public Policy Was Improperly Dismissed but Two Were Properly Dismissed.

In moving for summary adjudication, the Club argued that Cornell's three claims for wrongful discharge in violation of public policy—which are premised, respectively, on the claims for disability discrimination, disability harassment, and retaliation—failed because she was not entitled to protection under the FEHA. The trial court agreed and granted summary adjudication of all three wrongful-discharge claims.

Because we reverse the summary adjudication of Cornell's discrimination claim, we also reverse the summary adjudication of the accompanying claim for wrongful discharge in violation of public policy, which alleged that Cornell was terminated on the basis of her obesity. (See *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1158-1161 [claim for disability discrimination under the FEHA can support claim for wrongful discharge in violation of public policy].) Similarly, because we affirm the summary adjudication of the retaliation claim, we also affirm the summary adjudication of the accompanying claim alleging wrongful discharge in violation of public policy, which alleged that Cornell was terminated because she requested an accommodation for her disability. (See *Hanson v. Lucky Stores, Inc., supra*, 74 Cal.App.4th at p. 229.)

But even though we reverse the summary adjudication of Cornell's harassment claim, we conclude that the trial court properly granted summary adjudication of the accompanying claim for wrongful discharge in violation of public policy. In ruling on the latter claim, the court noted that it "duplicate[d]" Cornell's wrongful-discharge claim accompanying her discrimination claim. We agree with the court's assessment. Although Cornell alleged in the wrongful-discharge claim accompanying the harassment claim that she was harassed on the basis of her obesity in violation of public policy, she did not allege that the harassment resulted in a constructive discharge or otherwise contributed to her termination. Instead, she alleged that she was *terminated* in violation of public policy only because the termination was based on her obesity. Therefore, the claim for wrongful discharge in violation of public policy that accompanies the harassment claim was properly dismissed.

33

*E.      The Trial Court Properly Granted Summary Adjudication of the Claim for Intentional Infliction of Emotional Distress.*

Cornell argues that if we reverse summary adjudication of her disability-based FEHA claims, which we do, the claim for intentional infliction of emotional distress must also be revived. We are not persuaded. We agree with the Club that summary adjudication of Cornell's claim for intentional infliction of emotional distress was proper because she "cannot establish [the Club] engaged in 'extreme and outrageous' misbehavior."

The elements of a claim of intentional infliction of emotional distress are " ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' [Citations.] A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051.)

The trial court granted summary adjudication of the claim for intentional infliction of emotional distress because it was premised on Cornell's discrimination and harassment claims. Contrary to Cornell's position otherwise, however, our reversal of the court's ruling on those two claims does not compel reinstatement of the claim for intentional infliction of emotional distress. A plaintiff "may pursue a claim for intentional infliction of emotional distress in the employment context where the conduct at issue violates [the] FEHA *and also satisfies the elements of the claim*." (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 101, italics added.) Here, we conclude as a matter of law that neither Headley's comments, which were inappropriate but not severe, nor his official actions rise to the level of "outrageous conduct beyond the bounds of human decency." (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80 ["personnel management decisions" cannot support a claim of intentional infliction of emotional

34

distress even if undertaken with discriminatory motive].)  The court properly dismissed the claim for intentional infliction of emotional distress.

> F.     *The Defamation Claim Must Be Revived Because There Is a Triable Issue as to Whether the Challenged Statements Were Made with Actual Malice.*

Finally, Cornell claims that the trial court erred by granting summary adjudication of her defamation claim on the basis that the Club's statements were protected by the litigation privilege and common interest privilege.  We agree.  The litigation privilege does not apply, and there is a triable issue of material fact as to whether the Club made the statements with actual malice, defeating its reliance on the common interest privilege.

"Defamation is an invasion of the interest in reputation.  The tort involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage."  (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1179.)

Cornell's defamation claim covers statements by others that Cornell "illegally recorded a meeting of the . . . Board of Directors and later stole the recording device."  On appeal, the specific statements Cornell identifies include:  (1) Miller's statements to Rolley about Cornell's termination, including that Cornell had "planted" the recording device; (2) Miller's statements to Rolley and Club members that the attempt to tape the meeting was a crime and/or a felony; and (3) Gurganus's statements to Club members that the attempted taping "was a violation of the Penal Code."  The trial court granted summary adjudication of this claim because it agreed with the Club that the litigation privilege and common interest privilege protected the communications at issue.

### 1.     Litigation privilege.

With exceptions that are not relevant here, the litigation privilege applies to a "publication or broadcast" made in any "judicial proceeding."  (Civ. Code, § 47, subd. (b).)  "The usual formation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."  (*Silberg v. Anderson* (1990) 50 Cal.3d 205,

212.)  The privilege's primary purpose is "to encourage parties to feel free to exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation."  (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 29 (*Edwards*).)  The Club has "the burden of establishing the preliminary facts" to support its "affirmative defense of the litigation privilege."  (*Id.* at p. 37; see also *Consumer Cause, Inc. v. Smilecare* (2001) 91 Cal.App.4th 454, 469 [defendant relying on affirmative defense in moving for summary judgment has "an initial burden of production to make a prima facie showing" that defense applies], italics omitted.)

Although Civil Code section 47, subdivision (b) itself "includes nothing about communications made in a prelitigation context, . . . the courts have applied the [litigation] privilege to certain discrete categories of communications made in advance of actual litigation."  (*Edwards, supra*, 53 Cal.App.4th at p. 30.)  To be privileged, a prelitigation communication "must be 'in furtherance of the objects of the litigation' " and "relate[] to litigation that is contemplated in good faith and under serious consideration."  (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251.)  " 'Good faith' in this context refers to a good faith intention to file a lawsuit rather than a good faith belief in the truth of the communication."  (*Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 887.)  "Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact."  (*Action Apartment*, at p. 1251.)

*Edwards* recognized that "the 'bare possibility' that a judicial proceeding 'might be instituted' in the future 'is not to be used as a cloak to provide immunity' for fraud and other tortious conduct."  (*Edwards, supra*, 53 Cal.App.4th at p. 33.)  To protect against this, *Edwards* established four additional "parameters of the [litigation] privilege . . . defined by the reasons providing justification for its existence:"  (1) a judicial or quasi-judicial proceeding "must actually be suggested or proposed, orally or in writing";

36

(2) "the verbal proposal of litigation must be made in good faith" and not merely as "a negotiating tactic"; (3) "the contemplated litigation must be imminent"; and (4) "the litigation must be proposed in order to obtain access to the courts for the purpose of resolving the dispute." (*Id.* at pp. 33-36, italics omitted.)

In moving for summary adjudication, the Club argued that the litigation privilege applied to the allegedly defamatory statements about Cornell because they were made after her "lawyer sent the [Club] a letter promising litigation" and her father "republished [the] letter to numerous club members just two days later." In response, Cornell submitted a declaration from Tsai in which Tsai stated that the letter was intended "to resolve the matter without litigation" by having Cornell's employment reinstated and that Tsai's office ultimately never sent a demand letter or filed any claims on Cornell's behalf. Cornell argued that the privilege thus did not apply under *Edwards*, which held that "a threat of litigation . . . made merely as a means of obtaining a settlement" is insufficient to trigger the privilege. (*Edwards, supra*, 53 Cal.App.4th at p. 36.) The trial court agreed with the Club, ruling that the Tsai letter "expressly threaten[ed] litigation" and that *Edwards* was distinguishable on that basis. (See *id.* at pp. 37-38.)

We conclude that the litigation privilege did not justify summary adjudication of Cornell's defamation claim. As an initial matter, *Edwards* does *not* stand for the proposition that a letter from an attorney expressly threatening litigation is sufficient to give rise to the privilege. As *Edwards* explained, "even a threat to file a lawsuit," including one made in an attorney demand letter, is "insufficient to activate the privilege if the threat is merely a negotiating tactic and not a serious proposal made in good faith contemplation of going to court." (*Edwards, supra*, 53 Cal.App.4th at p. 35 & fn. 10.) Thus, the wording of the Tsai letter alone provided an insufficient basis to conclude that the privilege applied. Given that whether litigation is contemplated in good faith and under serious consideration is an issue of fact, Tsai's declaration was sufficient to create a triable issue of material fact about whether Cornell had the requisite mind state.

Moreover, even if we agreed that the Tsai letter conclusively demonstrated that *Cornell* contemplated litigation in good faith, the determinative issue is whether *the Club*

37

contemplated litigation in good faith.  "In order for [defendants] to be able to take advantage of the [litigation] privilege by applying it to their *own* communications, they must establish that at the time they made the subject communications, they *themselves* actually contemplated prospective litigation, seriously and in good faith."  (*Edwards, supra*, 53 Cal.App.4th at p. 39; see also *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1380.)  Here, the Club has identified no evidence that the allegedly defamatory statements were made when *it* contemplated litigation in good faith.  It is also far from apparent that the statements at issue were " 'in furtherance of the objects' " of any contemplated litigation or otherwise protected the Club's freedom of access to the courts.  (*Action Apartment Assn., Inc. v. City of Santa Monica, supra*, 41 Cal.4th at p. 1251.)  Therefore, the Club failed to carry its "burden to establish the preliminary facts on which to base [its] affirmative defense of privilege."  (*Eisenberg*, at p. 1379.)

        2.      Common interest privilege.

Under Civil Code section 47, subdivision (c), a "publication or broadcast" is privileged if it is made "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."  The privilege applies " 'where the communicator and recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest,' " which "must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business[,] or similar relationship or [where] the defendant is protecting his [or her] own pecuniary interest."  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 287.)  "Communications made in a commercial setting relating to the conduct of an employee have been held to fall squarely within the qualified privilege for communications to interested persons."  (*Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 995.)

38

The Club "bears the initial burden of establishing that the statement in question was made on a privileged occasion," and, if this initial burden is satisfied, the burden then shifts to Cornell to demonstrate that the statement was made with actual malice. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 721.) In moving for summary adjudication, the Club argued that the common interest privilege shielded "[t]he allegedly defamatory statements . . . made by Gurganus and Miller" because they were made in discussions only "with other club personnel or members . . .– i.e., the discussions were limited to those who had an interest in the club."

Cornell responded that it was not her burden to demonstrate malice but that even if it were, the evidence showed that the Club had "failed to thoroughly and adequately investigate . . . any of the defamatory allegations," particularly because Headley "was known to be biased against [her], unwilling to accommodate her disability, untruthful, and very much motivated to commit the alleged crime" of attempting to surreptitiously record the Board meeting. (Italics omitted.) Citing her own and her father's statements that they had heard from numerous other non-Club members that someone else had told them she was "terminated because she secretly planted a recording device in the Board meeting room," she also argued that "statements to non-[Club] members cannot possibly be privileged under any theory."

The trial court agreed that the common interest privilege applied to any statements made to fellow Club members, and it excluded as inadmissible hearsay Cornell's and Cornell's father's statements that non-members heard about Cornell's termination from others. The court found that Cornell had not met her burden of showing that the statements were made with malice because (1) it was unclear the Club had a duty to investigate before terminating an at-will employee; (2) Miller had seen her reaching into the area where the recorder was found, providing a reasonable ground to believe the statements were true; and (3) the statements incorrectly suggesting that if she planted the recorder she had committed a felony were merely negligent.

### a. The privilege applies to these circumstances.

Cornell argues that certain statements were made to people who did not have a common interest with the Club, defeating application of the common interest privilege. She claims that Miller's statements to Rolley were not made to further a common interest because "Miller made his unsolicited comments about [Cornell] in spite of Rolley's express desire not to hear them." Cornell asserts that "[o]n these facts, it cannot be said that Miller's statements were 'reasonably calculated to protect or further' an interest in common between him and Rolley." Cornell did not assert this factual theory in her opposition to the Club's motion for summary adjudication, however, and she has therefore forfeited it. (See *Peart v. Ferro* (2004) 119 Cal.App.4th 60, 70.)

In addition, Cornell claims that the trial court erred by excluding as hearsay the "evidence that defamatory publications were made to several non-Club members who had no need to know about the circumstances of [her] termination." We review the court's ruling for an abuse of discretion. (*People v. Pirwani* (2004) 119 Cal.App.4th 770, 787.)

Cornell relies on the " 'well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy is whether certain things were said or done and not . . . whether these things were true or false.' " (*Russell v. Geis* (1967) 251 Cal.App.2d 560, 571.) While this principle might justify admission of testimony by non-Club members that they were told Cornell was terminated for secretly planting the recorder, Cornell does not explain how her and her father's statements about what the non-Club members said they were told also fall into a hearsay exception. (See *People v. Arias* (1996) 13 Cal.4th 92, 149 ["multiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception"].) Therefore, she fails to convince us that the trial court's exclusion of this evidence was improper and, as a result, that any of the statements at issue were made to people who did not share a common interest with the Club.

b. There is a triable issue of whether actual malice existed.

Because the Club carried its initial burden, the burden shifted to Cornell to demonstrate a triable issue of material fact about whether the Club acted with actual malice in making the statements at issue. " ' "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." ' " (*Taus v. Loftus, supra*, 40 Cal.4th at p. 721; see also *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 729 [privilege does not apply if statement is motivated " ' "by any cause other than the desire to protect the interest for the protection of which the privilege is given" ' "].) We note that in arguing there is a triable issue about actual malice, Cornell focuses exclusively on the evidence to support a belief that she planted the recorder, not a belief that any such action constituted a felony. As a result, we do not address whether there is a triable issue as to whether the Club acted with actual malice in stating that Cornell's alleged conduct constituted a felony.

We conclude that there is sufficient evidence to create a triable issue of material fact as to whether the challenged statements about Cornell planting the recorder were made with actual malice. " '[M]alice focuses upon the defendant's state of mind, not his [or her] conduct.' " (*Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1370.) As we discussed above in addressing the issue of pretext, a triable issue exists as to whether Gurganus and Miller actually believed that Cornell planted the recorder. If they did not, in fact, believe this, then they acted with actual malice in stating that she planted the recorder. (See *Mamou v. Trendwest Resorts, Inc., supra*, 165 Cal.App.4th at pp. 691, 729-730 [triable issue of material fact as to actual malice based on "evidence from which a fact finder could reasonably infer that the authors of at least some of the defamatory statements knew they were false when made"].) Thus, our determination that there is a triable issue as to whether the two men actually believed Cornell planted the recorder compels us to conclude that there is a triable issue as to whether they acted with

41

actual malice in stating that she had.  We perceive no other basis on which to affirm the dismissal of Cornell's defamation claim, and we therefore reverse that ruling.

## III.
### DISPOSITION

The judgment is reversed in part as to Cornell's claims for discrimination and harassment under the FEHA, wrongful termination in violation of public policy based on the FEHA discrimination claim, and defamation.  The judgment is affirmed in part as to her claims for failure to accommodate and retaliation under the FEHA, wrongful termination in violation of public policy based on the FEHA harassment and retaliation claims, and intentional infliction of emotional distress.  The case is remanded to the trial court for further proceedings consistent with this opinion.  The parties shall bear their own costs on appeal.

_____

Humes, P.J.


We concur:


_____

Margulies, J.


_____

Banke, J.


*Cornell v. Berkeley Tennis Club*  A147516

Trial Court:

      Superior Court of the County of Alameda


Trial Judge:

      Hon. Brenda Fay Harbin-Forte


Counsel for Plaintiff and Appellant:

      Barbara A. Lawless, Lawless and Lawless

      Charles D. Yu, Lawless and Lawless

      Emily Stehr McGrath, Lawless and Lawless

Counsel for Defendant and Respondent:

      Kathleen M. Ewins, Long & Levit LLP

      Shane M. Cahill, Long & Levit LLP

*Cornell v. Berkeley Tennis Club*  A147516